NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TEXAS NATURAL GASOLINE CORPO-
RATION, Respondent.

No. 16665.

United States Court of Appeals
Fifth Circuit.

March 18, 1958.

———◆———

Stephen Leonard, Associate Gen. Counsel, N. L. R. B., William J. Avrutis, Atty., Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., for petitioner.

C. A. Kothe, W. H. Eyssen, Jr., Tulsa, Okl., for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

Since so much in this case is dependent upon the factual situation, it becomes necessary to relate the chain of events in some detail. The respondent, Texas Natural Gasoline Corporation, operated a number of natural gas processing plants. One of these was at Rankin, Texas, where fifty-eight persons were employed. Rex H. Snell was the plant superintendent. The plant operated twenty-four hours a day seven days a week. Production employees worked three shifts, 7 A.M. to 3 P.M., 3 P.M. to 11 P.M., and 11 P.M. to 7 A.M. During the early part of July, 1955, Snell was on vacation. During his absence there was some discussion among the employees about the organization of a union. Some sort of a document was prepared by or under the guidance of a union representative. It was never shown to any representative of the respondent and there is no reason to suppose that the respondent heard of it until after the happening of the events from which the controversy before us arose. Some, we do not know how many, of the employees signed the paper. The petitioner presumes the document was for the purpose of designating a union as the employee bargaining representative. If such it was, it did not, during the sequence of events here pertinent, effect the intended design. On July 8th, Snell returned from his vacation. Snell was told that an employee named Henley had been lying on his desk when he should have been working at it. Snell directed that Henley be discharged and Henley was discharged.

On the evening of July 8th a meeting of employees was held at the Court House in Rankin. Twenty or twenty-five of the employees were present. The union representative conducted the meeting and was the one who did the talking. The group decided, it seems, that unless Henley was reinstated they would strike at 3 o'clock the next day. At the meeting, a committee of four was selected and instructed to tell Mr. Snell that unless Henley was reinstated there would be a strike. The committee called on Snell on the following morning, July 9th. They stated that they were speaking for other employees as well as for themselves, that there was dissatisfaction over Henley's discharge and "some talk that they might walk out." Snell told the committee that several people had seen Henley lying on his desk and that this was something that could not be tolerated. The committee members responded that they had not previously understood it that way, and that Snell's explanation put a different light on the matter. On this note the interview ended.

Bill Hood was an office clerk in the respondent's plant. As an office employee his work hours were from 8 A.M. until 4:30 P.M. six days a week. He had been a teacher in the Rankin School System until its summer vacation and then went to work for respondent. The School Board had designated him as a teacher for the following year. During the summer school vacation of 1954 he had worked for the respondent. During the summer vacation of 1955 he lived in a teachery of the school system taking advantage of the reduced rental which teachers enjoyed. At the end of the summer vacation he resumed his activity in the teaching profession. He had attended the meeting on the evening of July 8th. On the afternoon of July 9th, about a quarter of three, Hood, who had apparently not been informed as to the result of the interview of the employees' committee with Snell, went to Snell and asked whether he could reconsider the discharge of Henley or did he want the employees to shut the plant down. He told Snell he was speaking as a representative of a majority of the employees. Obviously this was not so, and he made no effort to ascertain what had been done by the committee which had been selected to represent a group, but probably not a majority, of the employees. Snell gave Hood the same reason he had given the

committee for Henley's discharge. Snell's explanation to Hood did not, as it had done with the committee, put a different light on the matter, but Hood did agree that Snell should have the right to fire a man for lying down on the job. Before the discussion ended, Snell warned Hood that if he left before the end of his workday, "his check would be made out for him", and that so far as Snell was concerned his early leaving would be regarded as quitting. Hood told Kersten, the office manager, he was leaving and, at Kersten's request turned in his key. At or about three o'clock Hood took his departure. At the same time the seven to three plant shift was going out and the three to eleven shift was coming in. On coming out of the plant, Hood inquired of the shift workers as to how many were striking with him. He had no response.

Henley, expecting that he would either be back at the desk from which he had been evicted or the participant in a strike staged in his honor, had spent a part of the morning having some picket signs made and painted. He was joined by Hood at the gate to the plant on the highway a half mile distant and these two picketed for a while and then went to town. Hood did not then know of any other employees stopping work. So far as Hood then knew it was Henley and himself. July 9th was Saturday. On the morning of Monday, July 11th, Hood came to the plant and was told he had no job.

Shirley C. Little was a laboratory tester for the company. He was supposed to go to work at three in the afternoon. Instead, he went to the train rack and there, so he said, inquired of train engineers as to whether or not they would cross a picket line. No other employee was with Little. He was unaware of the activities of Henley and Hood. About four o'clock Snell came out, talked with Little and suggested he go to work. Little refused and Snell told him he could either go back to work or "that was it." Later Little went to the office where he was paid off. At this meeting Snell suggested that Little tear up the check

and go back to work. On the next day Little's replacement was hired. Little has not at any time sought re-employment.

On August 5, 1955, Henley filed a charge with the National Labor Relations Board that his employment had been terminated because of his activities on behalf of the union. On September 20, 1955, Henley filed an amended charge that the employment of Hood and Little had been terminated because of their union activities. A complaint was made against the respondent on the amended charge. A hearing was had before the Board. No contention was there made that Henley was not properly discharged and none is made before us. At the hearing, Hood was asked whether he was then desirous of reinstatement. He replied that he would if he thought there was any security but "under the circumstances right now, no." The Board found, on the report of its Trial Examiner, that Hood and Little engaged in concerted activity, and the respondent violated Section 8(a)(1) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq., by threatening and discharging them and in refusing to reinstate Hood at his request. The Examiner found that Henley was not an "employee" at the time he and Hood attempted to get a strike under way on the afternoon of July 9th. The Board took a different position and found that Henley was then an employee with whom Hood was acting in concert. The Board's order directed the respondent to cease and desist from threatening to discharge or discharging employees or otherwise interfering with rights of employees under Section 7 of the Act, to offer Little, on request, re-employment, to offer Hood re-employment and to make Little and Hood whole for loss of pay; and to post a notice. We are asked to decree enforcement of the Board's order.

The complaint stated that respondent discharged and refused to reinstate Hood and Little because of union activity or for engaging in other concerted activities for the purposes of collective bargaining or other mutual aid or protec-

tion. The Board's finding was only of a violation of Section 8(a) (1) of the Act, thus removing from the case any question of coercion for union activities or with respect to collective bargaining. The propriety of the discharge of Henley is not questioned. The Examiner found that Henley was not an employee on July 9th and hence Hood's activities in concert with Henley on the afternoon of that day were not within the protection of the Act. The Board held that Henley was an employee within the meaning of the Act and before us urges that the holding is correct. Both the Examiner and the Board reached the conclusion that Hood and Little were acting in concert. The respondent contends that these determinations of the Board, as well as others, are erroneous. Henley had been discharged and it is not now asserted that his discharge was by reason of any protected activity.

■■ The status of Henley on July 9th was not within the commonly accepted meaning of the word "employee." We are reminded though that technical concepts of employment are to be rejected in determining whether at a specified time a particular person is an employee within the meaning of the Act. National Labor Relations Act, Sec. 2(3), 29 U.S.C.A. § 152(3); Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217; N.L.R.B. v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, rehearing denied 322 U.S. 769, 770, 64 S.Ct. 1148, 1149, 88 L.Ed. 1595; N. L. R. B. v. George D. Auchter Co., 5 Cir. 1954, 209 F.2d 273. We do not have here a case where it is claimed that an applicant for employment is an employee, nor is our case one involving a person wrongfully discharged. The statement that "employee" includes any member of the working class is too broad. No precedent is brought before us which holds that an employee who has been rightfully discharged for a cause wholly unrelated to any activity within the protection of the Act continues to be an employee within the intent and meaning of the Act. We

conclude that Henley was not an employee at the time of his unsuccessful efforts to get a picket line set up and hence Hood's participation with him in that endeavor was not a "concerted activity" within Section 7 of the Act, 29 U.S.C.A. § 157.

■ But, it is urged, there was a "concerted activity" between Hood and Little. Hood thought, when he walked off the job, that he was going to strike and when he got to the gate he talked to some of those whose workday had just ended for the purpose of finding out "whether we were supposed to be striking." Hood concluded, apparently, and we think correctly, that there was no strike. He was asked by some of those coming off shift to tell them "what the deal was" and his testimony was, "I couldn't—I would like to have been able to tell them we were striking but I was unable to because there evidently wasn't much."

■ Little thought Henley had been given a raw deal. He had not been at the meeting held on the evening of July 8th, and had not been at the plant on July 9th until three o'clock or thereabouts that afternoon. He talked to the engineers of the Santa Fe Railroad to see if they would cross a picket line, but Little had no picket line and did no picketing. All he did and all he set out to do was to talk to the engineers. There is no showing of any concert of plan between Hood and Little. There was no indication that Little knew that Hood was at the gate while he, Little, was at the train rack talking to the engineers; nor does it appear that Hood knew of Little's absence from work while he, Hood, was wondering whether or not there was a strike. While there should be no interpretation or application of the Act which would deny to employees the rights which the Act provides, or restrict the exercise of those rights, the language used should not be distorted so as to reach unintended results. We are unable to see any activity in which both Hood and Little were engaged, and we are unable to find any concert of activity between them. We

reach the conclusion that they were not in any concerted activity.

It may not be amiss to observe that after Little was discharged, he was asked to tear up his check and go back to work. He declined doing so because of his anger at the other employees who "ran off and left" him "done hooked." Little was offered re-employment and rejected it. There is much that can be said in support of the contention that Hood, as a school teacher, was only a temporary employee of the Respondent. Since we have reached the conclusion that he was not discharged for any protected activity, we need not ascertain the nature of his employment.

For the reasons herein stated, the enforcement of the Board's order will be denied.

Enforcement denied.