**SIGNAL OIL AND GAS COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 21745.**

United States Court of Appeals Ninth Circuit.

March 4, 1968.

Norman G. Kuch, Los Angeles (argued), A. E. Stebbings, Harold Judson, Los Angeles, Cal., for appellant.

Abraham Siegel, Washington, D. C. (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, H. M. Levy, Eugene B. Granof, N.L.R.B., Washington, D. C., Ralph E. Kennedy, Director, N.L.R.B., Los Angeles, Cal., for appellee.

Before BARNES and DUNIWAY, Circuit Judges, and HILL\*, District Judge.

\* Hon. Irving Hill, United States District Judge, Los Angeles, California, sitting by designation.

BARNES, Circuit Judge.

This case is before us pursuant to sections 10(e) and 10(f) of the National Labor Relations Act, 29 U.S.C. §§ 160(e), (f) (1964), which authorize our review of final orders of the National Labor Relations Board. The Board ruled on August 24, 1966, that the Signal Oil and Gas Company had violated sections 8(a) (1) and 8(a) (3) of the NLRA, 29 U.S.C. §§ 158(a) (1), (a) (3) (1964), by discharging from its employ one Louis Evans. Signal has petitioned this court for review of the Board's order implementing that ruling, asking that it be set aside, and in its answer the Board has cross-petitioned for enforcement of the order.

The controversy arises from incidents occurring in September 1965 in Bakersfield, California, where Signal has for some time operated a refinery and related petroleum facilities. Employees at the refinery itself were at that time represented by the Oil, Chemical, and Atomic Workers International Union, AFL-CIO, Local 1-19, whose collective bargaining agreement with Signal was about to expire; negotiations between union and company representatives concerning the terms of a new agreement were in fact then being carried on. Signal also employed nine truck drivers, who delivered oil products to local retail outlets, and an unspecified number of pipeline employees. Neither of these two groups was represented by any labor union. Evans, the employee in question, was one of the truck drivers.

On September 24, 1965, Evans was in Signal's Bakersfield dispatching office. In the presence of Fred Brown, his immediate superior, he engaged in a conversation with Walter Bright, a pipeline employee with whom he was acquainted. Bright asked what Evans thought concerning the possibility of an Oil Workers' strike at the refinery. Evans—who was the only one of the three individuals present to testify concerning his response—admitted that he replied, "Good, good, I hope they do." R.T. 15.

Later that day Brown telephoned his own superior, Malcolm Dawson, and reported Evans' remark. Dawson, however, testified that Brown quoted Evans as having said, "I hope they do [strike], maybe it will teach this cheap company something." R.T. 79. (Brown testified, but was not asked what he had heard Evans say.) The next week Dawson repeated Evans' comment (allegedly as it had been recounted to him) to James Rasbury, manager of Signal's Employment Relations Department. At the time, neither Dawson nor Rasbury discussed the possibility of any future action with regard to Evans' employment.

On September 28 or 29, however, Dawson and Rasbury met with H. J. Stroud, Signal's vice-president in charge of employee relations, to discuss a personnel problem unrelated to Evans. Following discussion of that matter Dawson reported Evans' comment to Stroud. According to Rasbury, Stroud responded that the remark "in and of itself" was "not worthy of discharge," but that he "would like to see what kind of an employee we have on our hands." R.T. 38. A check of Evans' personnel file (together with Rasbury's report of his "own knowledge" of Evans) revealed that he had been characterized as a "constant griper" and "complainer," R.T. 38, that he had been placed under surveillance on the basis of a suspicion that he had stolen gasoline from the company, and that his filing of a possibly fraudulent insurance claim (under Signal's health and welfare policy) was being investigated. Rasbury testified that there was at the time a "slowness" in Evans' unit, and that Signal was "just waiting to see whether business was going to pick up." R.T. 39, 40. He further testified that Stroud, having been informed concerning Evans' personnel file, stated,

"Why in the world are we keeping a guy like this on the payroll? If we want to lay a man off or get rid of one person up there anyway, and with the kind of record that this guy has, let's get rid of him." R.T. 40.

On September 30, in accord with this decision, Evans was given a termination slip, on which the reason for discharge was stated to be "poor attitude." Evans testified that when he asked Brown the reason for his discharge, he received the answer:

"Because you have been over to the Refinery talking to the employees about the Union and the Refinery called—the main office in Los Angeles, and had you fired." R.T. 18.

When he later called Dawson, however, Evans was told that Brown's explanation was incorrect, and that those making the decision had heard nothing regarding the allegations on which that explanation was based. Dawson then queried Evans about "the conversation with Mr. Bright," R.T. 88, and repeated that Evans had been discharged because his "attitude" had been poor.

On the basis of the foregoing evidence the Board found (in agreement with the trial examiner) that

"Evans was discharged because he expressed himself in sympathy with, and in support of, the strike activity of his fellow employees, that by engaging in such conduct, he was engaging in activity protected by [section 7 of] the statute, and that his discharge, therefore, was violative of both Section 8(a) (1) and (3) of the Act." C.T. 20.

Section 7 of the Act states that

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7," while section 8(a) (3) similarly makes it an unfair labor practice "to encourage or discourage membership in any labor organiza-

tion" by means of "discrimination in regard to hire or tenure of employment * * *." The Board's order requires Signal to cease and desist from the unlawful conduct found, to offer Evans reinstatement and back pay, and to post the usual notices announcing its compliance with the Board's decision.

In seeking to bar enforcement of the Board's order Signal puts forward two arguments. First, the company contends that it took action against Evans not because of his comment to Bright, but on the basis of his overall record and attitude—and that the Board erred in not so finding. And second, it argues that Evans' remark does not fall within the concept of "concerted activities for the purpose of * * * mutual aid and protection," as specified by sections 7 and 8(a) (1) of the Act, and that therefore it is not "protected activity" (for the exercise of which an employee may not be discharged).

It is clear that, although engaging in activity protected by section 7 of the Act "does not perforce immunize employees against discharge for legitimate reasons," Mitchell Transport, Inc., 152 N.L.R.B. 122, 123 (1965), petition to set aside denied sub nom. Hawkins v. NLRB, 358 F.2d 281 (7th Cir. 1966), a dismissal based primarily on an employee's union activity constitutes an unfair labor practice under section 8(a) (3). And, while determinations concerning the actual motive behind particular dismissals are often difficult, they must be made by the Board in the course of its official functions. Judicial review of such determinations is limited to decisions as to whether they are supported by substantial evidence. Here the Board concluded that Evans was discharged because of the pro-strike content of his remark to Bright, and, since that conclusion is supported by substantial evidence, Signal's first contention must be rejected.

The trial examiner rested his conclusion concerning the reason for Evans' discharge on his finding that "the report of Evans' remark to Bright

expressing his approval of the strike caused management to question his desirability as an employee and to institute the investigation" of his personnel file. C.T. 18. It is implicit in this finding that management's response to the comment was due at least in large part to its pro-strike sentiment rather than to its alleged anti-company flavor. Both of these findings are supported by substantial evidence. The rapidity with which Evans' remark was reported upward through Signal's managerial ranks and the nature of Stroud's response upon hearing of that remark make it fairly clear that Evans' file would not have been reviewed had he not made the comment in question. And, although Signal's contention that it looked only to the comment's alleged slur on the company rather than to its support for the Oil Workers' rumored strike is not entirely without support, such questions are primarily matters of inference which must of necessity be left largely to the trier of fact, with his command of the record as a whole and his opportunity to observe the witnesses. Here, Evans denied that he used language derogatory to the company; this testimony might properly have been credited, and that of the company officials—to the effect that they did not act because of Evans' support for a strike—disbelieved. This resolution of the issue might also have drawn at least some degree of support from the nature of Brown's reported comments concerning the reasons for Evans' discharge, and from Dawson's post-dismissal reference (in his telephone conversation with Evans) to "the conversation with Mr. Bright."

Thus, having reasonably found that the company's investigation of Evans was a direct result of his pro-strike remark, the trial examiner might properly have concluded that, regardless of Evans' work record, his dismissal also was a result of that remark. It was a permissible inference that an employer which had investigated one of its employees because of his union sympathies was not suddenly motivated by permissible considerations in immediately dismissing him.

■ The company's second general argument—that Evans' comment was not protected by section 7—rests on the contention that that comment was not made pursuant to a "plan," "joint scheme," or "pre-existing group understanding," nor did it specifically urge those before whom it was made to engage in "group action." And in support of the proposition that some such circumstance is requisite for a finding that the activity in question is protected under section 7, the company cites Mushroom Transportation Co. v. NLRB, 330 F.2d 683 (3d Cir. 1964); NLRB v. Texas Natural Gasoline Corp., 253 F.2d 322 (5th Cir. 1958); Continental Mfg. Corp., 155 N.L.R.B. 255 (1965); and General Elec. Corp., 155 N.L.R.B. 208 (1965).

Although this argument is by no means totally unfounded in view of the authorities cited, we are forced on consideration to reject it and to rely instead upon our statement in NLRB v. J. G. Boswell Co., 136 F.2d 585, 595 (9th Cir. 1943). that

> "[a] discharge of a non-union employee because of a * * * belief that he was sympathetic to, or active in, a union violates [sections 8(a) (1) and 8(a) (3)] * * *. The fact that the alleged union activity extends 'outside his own employment,' is immaterial."

■■ While the cases cited by Signal may properly be read to suggest that in some circumstances an entirely individual action or speech is not "concerted activity," we note the following language from the Third Circuit's *Mushroom Transportation* decision:

> "[A] conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing action or preparing for group action *or that it had some relation to group action in the interest*

*of the employees."* 330 F.2d at 685 (emphasis added).

The *relation* of speech to group action provides, we believe, the tie to the literal terms of section 7 necessary to bring such speech within its coverage.[1] The Act was designed primarily to guarantee employees the right to organize and to engage in joint action calculated to further their mutual interests, and it would be inconsistent with this purpose to construe section 7 in such a way as to exclude from its protection speech supporting such joint action. We see no justification for excluding Evans' remark from the scope of that section's application on the grounds, urged by the company, that it was (1) a "casual" remark, or (2) a remark aimed only at a single listener, Bright, who was not a member of the union upon whose strike plans Evans commented. The protection given by the Act is not so easily cabined. To employees as to other groups in society, speech—whether directed at a multitude or at a single listener—is often an essential means of achieving (albeit slowly and indirectly) social or economic goals. We cannot ignore in this context section 7's explicit protection of the right to "assist" labor organizations. The trial examiner found that Evans' comment

> "may be regarded as an expression of support for the proposed union activity of his fellow employees, made in anticipation that he or his group might receive similar support should the occasion arise." C.T. 19

Any finding of this nature, relating to intent, is necessarily based to some extent on inference; and, while perhaps disputable, the trial examiner's finding cannot be overturned by this court in view of the limited scope of our review.

It should be made clear also that what we have stated above requires us to sustain the Board's finding of an 8(a) (3), as well as an 8(a) (1), violation. For it can hardly be doubted that investigation and discharge of an employee because he makes a pro-union or pro-strike statement would tend within the meaning of the Act to "discourage membership in [a] labor organization * * *." Section 8(a) (3)'s prohibition of discriminatory employment practices calculated to have such a result has been held by the Supreme Court to encompass action which discourages "participation in concerted activities * * * such as a legitimate strike." NLRB v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963). That prohibition cannot, then, reasonably be considered inapplicable to action which discourages statements such as Evans', supporting such concerted activities—statements which, as we have found above, constitute protected, union-connected activity under section 7. Cf. Pittsburgh-Des Moines Steel Co. v. NLRB, 284 F.2d 74, 82 n.7 (9th Cir. 1960). As the Board points out, the subtlety of any such distinction would undoubtedly escape most employees, who would very likely (and with a good deal of justification) be as intimidated by a dismissal for pro-union "remarks" as by action taken in response to pro-union "activity." Moreover, since the discrimination here was (on the basis of the Board's findings) directly related to protected activity and hence "inherently destructive of employee rights," the intent requisite for an 8(a) (3) vio-

---

1. One might perhaps take this principle to distinguish the facts of at least three of the four cases cited by Signal. *Mushroom Transportation* involved an employee's offer of advice to others concerning their rights as employees, but no efforts whatsoever to take action regarding the various matters to which the advice related were found to have been made. In *Continental Manufacturing*, an employee protested plant conditions individually, without urging any concerted action. And *General Electric* concerned one employee's "personal" attempt to get a particularly energetic fellow worker to "slow down" his work pace. Only in *Texas Natural Gasoline* can any substantial suggestion of joint activity be found. Insofar as any one or more of these cases may be inconsistent with the result which we reach, however, we decline to follow them.

lation may be inferred. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1792 (1967).

Signal's petition to set aside the Board's order is denied, and enforcement of the order is decreed.