**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BUDDIES SUPERMARKETS, INC., Respondent.**

No. 72–3023.

United States Court of Appeals, Fifth Circuit.

June 25, 1973.

G. Mallet Prevost, Asst. Gen. Counsel, N.L.R.B., Elliott Moore, Acting Asst. Gen. Counsel, Washington, D. C., Elmer P. Davis, Director, Region 16, N. L.R.B., Fort Worth, Tex., Charles P. Donnelly, N.L.R.B., Washington, D. C., for petitioner.

Edward L. Kemble, Fort Worth, Tex., for respondent.

Before WISDOM, GEWIN and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order holding that Buddies Supermarkets, Inc. (Company) violated §. 8(a)(1) of the National Labor Relations Act[1] by discharging Charles Ray Smith for his participation in certain protected concerted activity; and § 8(a)(1) and (3)[2] by discharging Nona B. Greever for her support of the union.[3] Having carefully examined the record in light of the applicable legal principles, we hold that enforcement of the Board's order must be denied in all respects.

### I. The Discharge of Charles Ray Smith

Charles Ray Smith was hired by the Company in 1961 and for the greater part of his tenure there, he drove a truck hauling milk to the Company's various stores. Prior to 1969, he and the other milk drivers were paid by the hour. But in December of that year, the company decided to change the method of compensation and called a meeting of the drivers to announce the new plan. The drivers were told that thereafter they would be paid on a commission basis. The understanding was reached, however, that the new compensation plan was being tried on an experimental basis and the drivers were given the option of returning to the former pay arrangement at the end of the quarterly period if they desired.

During the ensuing weeks, the advantages of returning to an hourly rate of pay were discussed on several occasions. The drivers finally decided against a change at that time. But from that point on, their attitudes towards the Company's pay plan steadily began to sour. This was brought about mainly because of the Company's decision to change from a Fort Worth to a Dallas milk supplier. As a result, the drivers were faced with the prospect of driving greater distances each day and working considerably longer hours, all without a proportionate increment in pay.

Quite predictably, they were concerned by this development and more meetings were held among themselves to assess the situation. Though they all indicated a desire to return to an hourly rate of pay, no group spokesman was appointed nor was any specific group action discussed. The most that can be said of Smith's role to this point was that one of his fellow drivers believed that he would bring the matter to the Company's attention.

Finally, at a meeting called by the Company on April 21, 1970, Smith did just that and was met with a sharp rebuff from Vice President Berman. Berman explained that it would be of no avail to the drivers to abandon the com-

1. 29 U.S.C. § 158(a)(1).

2. 29 U.S.C. § 158(a)(1) and (3).

3. Retail Clerks International Association, AFL–CIO, Local 368.

mission system of compensation since he would merely hire additional drivers and limit their hours so that their incomes would not exceed present levels. He further indictated that if they were adamant on this question, he would "have four new drivers there in the morning." Thus faced with this alternative, the drivers decided to renew their contracts on substantially the same terms as before.

A period of relative calm followed. It lasted until early December 1970 when the contracts were again up for renewal and the Company wanted to reduce the commissions for drivers in the highest bracket of milk sales. This provision had a direct effect on Smith and Weaver, the two top salesmen, and consequently they refused to sign the proposed new contracts. Neither desired to receive less compensation than they had received during the previous quarter. The Company representative agreed that some adjustment in terms was in order and in early January of 1971 superseding contracts were offered to all four of the drivers. Apparently, only Smith refused to sign.

He continued to be dissatisfied with the proposed terms, particularly his commission rate, and asked for still further reconsideration of his contract by the Company. There is no evidence that he was seeking modifications in the commission rate or any other provisions of the contract for the benefit of anyone but himself. On January 19, when it became clear that no additional concessions were going to be granted, Smith finally signed a contract. He was told that, "Mr. Berman wasn't going to make a special program" just to suit him.

Almost two months later, on March 10, 1971, Smith was fired. The reasons given for this action were that he was a chronic complainer who caused dissension among the workers by telling them about his problems with the Company's commission plan. He accused the Company of unfair conduct and treatment. The Trial Examiner held that Smith was discharged for engaging in § 7 protected concerted activity. The Board affirmed in all respects. For reasons stated in the remainder of this opinion, we cannot agree.

To support the Board's finding that Smith's discharge was unlawful, it is the black letter rule in this circuit [4] and others [5] that there must be substantial evidence in the record showing that the employee was engaged in concerted activity for the purpose of mutual aid and protection and that the employer had some knowledge of this at the time of the discharge. The basic question here is whether Smith's efforts to gain more favorable contract terms for himself constituted protected concerted activity within the meaning of § 7 of the National Labor Relations Act. The answer to this question lies in the distinction between concerted and non-concerted activity. If Smith's actions can properly be classified as individual griping or complaining, then it is clear that under the applicable authority [6] the Board's decision must be reversed. Such conduct has never been considered protected. On the other hand, if in Smith's efforts to gain more favorable contract terms for himself, there is some element of collective activity or contemplation thereof, then it is likewise clear

4. Southwest Latex v. NLRB, 426 F.2d 50, 56 (5th Cir. 1970); NLRB v. Atkins Saw Division of Nicholson File Co., 399 F.2d 907, 911 (5th Cir. 1968); NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859 (5th Cir. 1966).

5. Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir. 1969); Signal Oil and Gas Co. v. NLRB, 390 F.2d 338 (9th Cir.

1968); Indiana Gear Works v. NLRB, 371 F.2d 273 (7th Cir. 1967).

6. Southwest Latex Corp. v. NLRB, 426 F.2d 50, 56 n. 3 (5th Cir. 1970); Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir. 1969); Indiana Gear Works v. NLRB, 371 F.2d 273, 276 (7th Cir. 1966); NLRB v. Office Towel Supply Co., Inc., 201 F.2d 838 (2d Cir. 1953).

that the Board's order must be enforced.[7]

One of the leading cases on this issue is Mushroom Transportation Co. v. NLRB.[8] In that case, the court made a penetrating analysis of the nature of concerted activity as a prelude to its holding that the discharge of an employee was not unlawful under § 8(a)(1) even though the employee was engaged in advising his fellow workers about their rights under an existing collective bargaining agreement. The court observed:

> It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and listener, but to qualify as such, it must appear *at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interests of the employees.*
>
> This is not to say that preliminary discussions are disqualified as concerted activities merely because they have not resulted in organized action or in positive steps towards presenting demands. We recognize the validity of the argument that . . . it would come very near to nullifying the rights of organization and collective bargaining guaranteed by Section 7 of the Act if such communications are denied protection because of lack

of fruition. However, that argument loses much of its force when it appears from the conversations themselves that no group action of any kind is intended, contemplated or even referred to.

> *Activity which consists of mere talk must, in order to be protected, be talk looking toward group action.* If its only purpose is to advise an individual as to what he could or should do without involving fellow workers or union representation to protect his own status or working position, it is an individual, not a concerted, activity, and, if it looks forward to no action at all, it is more than likely to be mere "griping". (Emphasis added)[9]

The *Mushroom Transportation* decision has been expressly followed in a number of subsequent employee discharge cases,[10] but a cursory review of our court's decisions on this point will show that none are direct descendants of *Mushroom Transportation.* Nevertheless, in resolving the question now presented, we are strongly persuaded to place primary reliance on that line of authority.[11] In doing so we are guided principally by Southwest Latex Corp. v. NLRB.[12] In that case this court indicated its awareness of the *Mushroom Transportation* standard and cited two important post-*Mushroom Transportation* decisions as authority for the proposition that individual griping and com-

**7.** Mushroom Transportation Co. v. NLRB, 330 F.2d 683, 685 (3d Cir. 1964). See also Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir. 1969); Owens-Corning Fiberglas Corp. v. NLRB, 407 F.2d 1357, 1365 (4th Cir. 1969); NLRB v. Guernsey-Muskingum Elec. Co-Op., Inc., 285 F.2d 8, 12 (6th Cir. 1960).

**8.** 330 F.2d 683 (3d Cir. 1964).

**9.** Id. at 685.

**10.** Indiana Gear Works v. NLRB, 371 F.2d 273 (7th Cir. 1967); Signal Oil and Gas Co. v. NLRB, 390 F.2d 338 (9th Cir. 1968); Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir. 1969); NLRB v.

Northern Metal Co., 440 F.2d 881 (3d Cir. 1971).

**11.** Perhaps it can be argued that the view of concerted activity taken in *Mushroom Transportation* may be more liberal than the approach exhibited in earlier fifth circuit decisions such as NLRB v. Texas Natural Gas Corp., 253 F.2d 322 (5th Cir. 1958). But we are *undisturbed* by that fact, if indeed it is a fact, since it appears to us that the jurisprudence in recent years has indicated increasingly wide acceptance of the analytical standards established in *Mushroom Transportation.* See note 10 *supra.*

**12.** 426 F.2d 50 (5th Cir. 1970).

plaining are not protected concerted activity.[13]

▉ Applying these principles to the case at hand, this court is unable to uphold the Board's finding of an § 8(a)(1) violation by the Company. The unusual thing about this case is that, unlike many of the Board decisions we review, the outcome turns more on a question of law than fact. Indeed, the central factual determinations of the Board for the most part appear to be uncontroverted and, to state our view of the case in brief, these facts as a matter of law simply cannot be equated with concerted activity.

The Board undertook to bring this case within the decision in NLRB v. Interboro Contractors, Inc.[14] The gist of that opinion is that any activity involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes notwithstanding the absence of any overt interest on the part of fellow employees. In line with this rationale, the Board placed special emphasis on the fact that Smith was the most vocal and assertive of the four drivers in presenting his views to Company officials. It then reasoned that since he was speaking on matters of common concern to all of the drivers, he was *ipso facto* engaged in concerted activity. Building on this conception of Smith's conduct, the Board added further that Smith's forceful expression of the driver's grievances amounted to a clear invitation to his peers to join him in his protests and thus was intended to arouse some form of group action within the reasoning of *Mushroom Transportation.*

In reaching its decision we think the Board made two fundamental errors. The first has to do with its simultaneous reliance on the *Interboro* and *Mushroom Transportation* decisions. There appears to be a special irony in such reliance. Recently, the third circuit in NLRB v. Northern Metal Co.[15] expressly refused to follow *Interboro* on the ground that it represented an unwarranted expansion of the definition of concerted activity enunciated in *Mushroom Transportation.* Such a decision might easily have passed unnoticed as a typical doctrinal clash between circuits if it were not for the fact that the third circuit is the same court that decided *Mushroom Transportation* in 1964. We are persuaded by the reasoning in *Northern Metal,* however, that a statutory basis for the concerted activity rule announced in *Interboro* is questionable and hence we decline to follow that decision.[16] Moreover, apart from the fact that the *Interboro* decision has not received wide acceptance, there is another reason why it does not apply in the context of this case. *Interboro* is distinguishable on its facts since Smith's activity here did not arise in the framework of an attempt to enforce an existing collective bargaining agreement. Thus, even if we were to fully agree with *Interboro,* this distinction would appear to place the instant case in a wholly different category. The essence of our holding therefore, is that regardless of our analysis of *Interboro* the result remains the same; the Board's reliance on it for its finding of concerted activity cannot be sustained.

The second error committed by the Board arises from its misapplication of

13. Id. at 56 n. 3 of 426 F.2d citing Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345 (3d Cir. 1969) and Indiana Gear Works v. NLRB, 371 F.2d 273 (7th Cir. 1967).

14. 388 F.2d 495, 500 (2d Cir. 1967).

15. 440 F.2d 881 (3d Cir. 1971).

16. Even the second circuit found it necessary to restrict the logic of the *Inter-*

*boro* decision. In NLRB v. John Langenbacher Co., 398 F.2d 459, 463 (1968), it held that an attempt by employees to enforce their understanding of a collective bargaining agreement is a protected activity " . . . if the employees have a *reasonable basis* for believing that their understanding of the terms was the understanding that had been agreed upon. . . . " (emphasis supplied)

*Mushroom Transportation.* While it is clear that the activity of a single employee may be protected in certain circumstances,[17] we do not find the appropriate circumstances to be present in this case. The record does not support the Board's conclusion that Smith was inviting the other drivers to join him in his protests and thereby was seeking to instigate some form of group action. The underlying reasoning is much too fine spun and, in our opinion, is based on an unreasonably narrow view of the record.

Our point can be supported by at least two illustrations. First of all, Hawkins and Weaver, two of Smith's fellow drivers, both said that no spokesman was ever designated by the group, and further that at no time did Smith speak with the Company on their behalf. While neither factor is essential to a finding of protected concerted activity,[18] their absence in this case tends to undermine the Board's position. Secondly, the evidence further discloses that Smith's complaints about the Company's compensation plan were advanced entirely in pursuit of personal, not group, economic goals. This became increasingly evident after the milk drivers' meeting with Company officials in December 1970. Smith's displeasure with the contract terms offered by the Company at that time would not be abated. He refused to sign the proposed agreement. The fact that Weaver did likewise does not alter our view of the nature of Smith's conduct.[19] On the contrary, we think it is most significant that well after Weaver and the other drivers abandoned negotiations with the Company and signed employment agreements, Smith was still persisting in his efforts to get a more favorable commission rate written into his individual contract. Even if his success in this regard might have inured to the benefit of the other drivers, it is an exceedingly tenuous basis upon which to rest a finding of concerted activity. In fact he did not succeed. According to the Company, this unfortunate turn of events prompted him to make his individual grievance known to a number of fellow employees and at least one management level official. There is no substantial evidence that the purpose of these conversations was to arouse concerted action. The standards for determining the existence of concerted activity set forth in *Mushroom Transportation* and subsequent decisions have not been met. The substantial record evidence indicates that Smith was discharged solely because of his individual griping and complaining, activity which is beyond the scope of the § 8(a)(1) protections.[20] The Board's order insofar as it applies to Charles Ray Smith will not be enforced.

## II.  *The Discharge of Nona B. Greever*

■■  We now come to a consideration of the facts with respect to the discharge of Mrs. Nona Greever. We are fully aware of the standards which we should follow in making our decision. If there is substantial evidence to support the conclusions reached by the trial examiner and the Board, we are not authorized to upset those conclusions simply because we may have made another choice. It is our duty to review the record as a whole, not in isolated segments, in determining whether the action of the Board is supported by substantial evidence.[21] In our consideration we have given full weight to the credibility findings of the trial examiner.

17. Signal Oil and Gas Co. v. NLRB, 390 F.2d 338 (9th Cir. 1968); NLRB v. Guernsey-Muskingum Elec. Co-Op., Inc., 285 F.2d 8 (6th Cir. 1960).

18. Hugh H. Wilson Corp. v. NLRB, 414 F.2d 1345, 1349 (3d Cir. 1969); NLRB v. Guernsey-Muskingum Elec. Co-Op., Inc., 285 F.2d 8, 12 (6th Cir. 1960).

19. Indiana Gear Works v. NLRB, 371 F.2d 273 (7th Cir. 1967).

20. See cases cited note 6 *supra.*

21. Universal Camera Corp. v. NLRB, 340 U.S. 474, 96 L.Ed. 456 (1951); NLRB v. W. R. Bean & Son, Inc., 450 F.2d 93 (5th Cir. 1971); Southwest Latex Corp. v. NLRB, 426 F.2d 50 (5th Cir. 1970).

It is not necessary to outline all of the evidence in minute detail, but a summary of it is important. In September 1970 the union conducted an organizational campaign in the Buddies Market Stores. During this campaign, Mrs. Greever was openly opposed to the union. The events involved in this case took place in early March 1971 some 5 or 6 months later. Mrs. Greever does not claim to have engaged in any union activity prior to the week of March 3, 1972. Her discharge occurred one week later on March 10, 1972. She testified that late in February of that year while she was absent from her home, a union organizer left some union literature for her with her husband. She further asserted that during the week of March 3, 1972 she discussed the union with four fellow employees and that prior to that week she had a telephone conversation with union organizer Heise. In her conversations with co-workers, she claims to have inquired into their views about the union; suggested that the employees needed some sort of an organization; and on at least one occasion recommended union membership. Only two of the employees with whom she talked appeared as witnesses. Both of them contradicted her, one stating that she did not talk with Mrs. Greever until after her discharge and the other stating that Mrs. Greever did not discuss the union with her prior to discharge. The union organizer, Heise, stated he too did not have a conversation with Mrs. Greever until after her discharge.

It is undisputed that on the day of her discharge she took a "break" during the morning. At that time she saw store manager Hall and stated to him that she had the understanding that the Company had a rule which required employees to disclose union activity of certain types. The trial examiner found that there was no such rule, but apparently thought that Mrs. Greever believed one to be in effect. She explained to Hall that in late February a union organizer had left union literature at her residence. There was no discussion of the matter and the conversation ended.

Soon after lunch on that day, pursuant to strengthened security procedure, Mrs. Greever was requested to submit to a polygraph test to which she readily agreed. The test was unfavorable but she was not advised of that fact. She admitted to a security agent that she had "grazed" or taken merchandise from the store (candy) in the amount of fifteen cents. Soon after the polygraph test, in the presence of store manager Hall and another company official, Mrs. Greever was discharged for grazing. She expressed disappointment over the fact that she would be discharged for such a minor infraction.

At the hearing the company expanded its reasons for discharging Mrs. Greever, claiming that she had been suspected of shortages some two and a half years prior to this time. They further asserted that while two or three polygraph tests had reflected unfavorably upon her honesty as an employee, they were "afraid" to inform her of the results because of possible liability for slander. We do not disturb the findings of the Trial Examiner that Buddies had a history of anti-union animus; that Mrs. Greever was permitted to serve as cashier on occasions during rush hours; and that some employees who were also guilty of grazing, perhaps in larger amounts, had not been discharged. But it is critically important to recognize that these findings are peripheral to the main question presented by Greever's discharge. A proper approach to this aspect of the case requires that three considerations be kept in mind: (1) whether Mrs. Greever was a union supporter; (2) did the Company know or should it have known that she was a union supporter; and (3) whether her discharge was motivated by her support of the union.[22]

22. The rule is well established that absent a showing of anti-union animus by the

Company, an employee may be discharged for good reason, bad reason or

Of some importance is the fact that not until the day of her discharge did Mrs. Greever mail a card to the union evidencing her support of it. She first testified that she mailed the card in the afternoon but later amended her testimony to assert she mailed it that morning. In addition to her statements with respect to her support of the union, there is also evidence that she became a much more ardent supporter after her discharge than she ever was prior to that time.

■ We have considered the "small plant doctrine," [23] heavily relied on by the Trial Examiner. This doctrine has its place but we are doubtful that it can fill a total void of evidence with respect to knowledge of union activity on the part of the Company. Here there is nothing to indicate that the Company was ever actually informed of Mrs. Greever's union sympathies. Not a single employee was presented who corroborated her assertion that she was a union proponent prior to her dismissal and she claims to have discussed the union with at least four. The two who did testify contradicted her story. Thus, if Greever's co-workers who appeared to be friendly to her were ignorant of such a pivotal fact as union sympathy, the "small plant doctrine" should not apply. That doctrine is predicated upon the idea that the Company learns through the grapevine what is well known to its employees or a segment of them.

■ However, leaving that problem aside for the moment, the question still remains whether, taking a view of the record most favorable, Greever, knowledge of Greever's union support could reasonably be imputed to store manager Hall, who was transferred to the store approximately thirty days before her dismissal. We think not. This is clearly not a case where the store manager had long been familiar with the activities and attitudes of the several employees under his supervision. In addition, where the "small plant doctrine" is applied, there is usually more evidence to support knowledge on the part of management than appears to be true here.[24] Our decision should not be grounded on unwarranted speculation. One week of doubtful and unnoticeable alleged union activity disputed by friendly fellow employees in a store where the manager had only recently been assigned does not constitute substantial evidence to support the Board's decision when considered in conjunction with the record in its entirety.

■ We reach our conclusion with a full evaluation of the fact that the Trial Examiner discredited much of the testimony presented by the employer and fully credited the testimony of Mrs. Greever, even that which was contradicted by the union organizer and two fellow employees. By the technique of making credibility choices, the trial examiner should not be allowed to reach factual conclusions which are not supported by substantial evidence. Based upon an evaluation of the record as a whole, we conclude there is no substantial evidence to support the conclusion that the Company knew or should have known that Mrs. Greever was a union adherent. Regardless of the Company's general attitude toward unions we are unable to hold that they discharged Mrs. Greever unlawfully because of her union sympathies.

Enforcement denied.

---

no reason at all. NLRB v. I. V. Sutpin Co.-Atlanta, Inc., 373 F.2d 890 (5th Cir. 1967). The corollary of that rule is that to prove a violation of § 8(a)(1) and (3) in a discharge case, knowledge by the employer of the employee's union activity must be proved. Texas Aluminum Co. v. NLRB, 435 F.2d 917, 919 (5th Cir. 1970).

23. NLRB v. Mid States Sportswear, Inc., 412 F.2d 537, 539 (5th Cir. 1969). See also A. J. Krajewski Mfg. Co. v. NLRB, 413 F.2d 673, 676 (1st Cir. 1969).

24. See note 23, *supra*.