**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHARLES H. McCAULEY ASSOCIATES, INC., Respondent.**

No. 80–7486.

United States Court of Appeals,
Fifth Circuit.

Unit B

Sept. 28, 1981.

Elliott Moore, Deputy Associate Gen. Counsel, Bernard Jeweler, Atty., NLRB, Washington, D.C., for petitioner.

Markstein & Morris, D. H. Markstein, Jr., C. V. Stelzenmuller, Donald B. Sweeney, Jr., of Markstein & Morris, Birmingham, Ala., for respondent.

Before GODBOLD, Chief Judge, FRANK M. JOHNSON, Jr. and ANDERSON, Circuit Judges.

GODBOLD, Chief Judge:

This is a § 8(a)(1) and (3) case involving a single employee, Richard Beck. The Board seeks enforcement of its order. Up to 1979 Beck had worked for Charles H. McCauley Associates, Inc., an architectural firm, for about seven years as a draftsman. The company's volume of work, and hence its work force, had materially declined during the 1970's.

In January 1979 Beck talked with fellow employee Tate about improving working conditions, particularly with respect to the frequency of wage increases. Beck asked Tate what he thought the company's response would be if someone tried to organize a union.

In February 1979 Beck had a similar conversation with fellow employee Conville. They also discussed the termination of another employee, and Beck asked "what's going to happen to us?" Beck noted that the company had once been large but had become small, and he expressed concern for employees' continued tenure. Beck told Conville that "somebody might try to organize a union one day" and asked Conville what he thought of this.

There is no evidence that any of these conversations between Beck and fellow employees came to the attention of management.

During February Beck had discussions with the company concerning terms of a proposed new written employment agreement, which Beck thought contained errors. The agreement was changed to accord with Beck's contentions and he signed it.

In late February Beck prepared an interoffice memorandum addressed to the company's officers and supervisors—the chairman of the board, president and vice president—in which he requested a meeting with these three persons. Before he submitted the memo Beck showed it to Tate and said he was going to hand it in and request a meeting. Beck told Tate that he was ready to have a meeting with the officers "to discuss better working conditions and better wages and better benefits and see what they would think about it for you and I and all the rest of the employees." Beck asked Tate whether he would like to accompany him into the meeting and told Tate that if the company was not willing to be fair and give them a better contract he [Beck] "was going to bring up the possibility of trying to possibly get an outside third party to come in and try to bargain for [them]."

Beck submitted his memorandum to the company officials, and shortly thereafter he met with them. Tate did not attend. Following is what occurred at the meeting under the facts as found by the Board. Beck expressed concern over the reduction in force of the company and expressed fear for his job security. He expressed objections to the wage agreement that he had

earlier signed, contending that it was unfair, one-sided, incorrect and inadequate and that he and his fellow employees needed something better. He asked for a written employment contract that would guarantee him a job for as long as the company was in operation and he did his work. Beck complained about what he felt were unfair actions by the company in laying off more experienced and better educated draftsmen while retaining others with less experience and seniority. He asserted that the company had reduced the hours of some draftsmen while allowing others to work full weeks and even overtime. He questioned the company's practice concerning wage increases and objected to the absence of cost of living increases and to the necessity for employees to specifically request an increase or threaten to leave the company in order to get a raise. He objected to revisions in the company's retirement plan, to the failure to absorb increases in employees' health insurance premiums, and to the discontinuance of the practice of giving Christmas bonuses. He asked for reinstitution of a four and one-half day work week rather than the five day work week in effect and said that other employees wanted the same thing but would not come in and request it. Beck stated that he was seeking a better contract for all employees, not just for himself, that he wanted a fair contract and better benefits for all the employees.

The board chairman told Beck the company would consider his points. To Beck's request for a written contract guaranteeing him a job as long as the company operated and he did his work, the president responded that "union or no union, neither you nor [I] as president, nor any other employee was going to get the type of employment contract that [Beck] wanted." Beck then stated that there was a failure of communication, that he was going to discuss with fellow employees the matters he had raised and see if he could get their thoughts together on a contract to submit to the company. The chairman forbade Beck to discuss with other employees the matters that had been discussed in the meeting. When Beck repeated that he was going to talk with other employees about the things discussed in the meeting the chairman again told Beck that he was forbidding it and that if Beck had such discussions the company would consider terminating him.

Beck told the officers that the company left him no alternative except to contact the local union representative to come in and try to bargain. The chairman responded by forbidding Beck to contact any type of union representative and stating that the company "will not tolerate a union," and saying that neither Beck nor any other employee would have the type of contract that Beck wanted, that the matters they had discussed would not be discussed with any union representative. When the chairman asked Beck whether he was serious in what he had said he would do, Beck responded that he had to try to get some job security for himself and his fellow employees. The chairman then discharged Beck on the spot. At this meeting there was no mention of any deficiency in Beck's work or behavior.

The company's version of the meeting was along the following lines. Beck expressed concern for his job security and asked for a written contract guaranteeing him employment as long as there was work and he did his job. Beck insisted he would get a written contract or seek union assistance. The president told him that union or no union there would be no written contract. Management insists that Beck only sought a written agreement covering himself, but they acknowledge that he mentioned health benefits, pension rights and wage increases for himself and other employees.

The company contends that Beck was chronically absent from work and tardy and was a marginal employee from whom it would not accept unreasonable personal demands. The demands made in the meeting were the straw that broke the camel's back.

■ The initial issue is whether Beck was engaged in activity that is protected by the National Labor Relations Act. The company urges that he was not engaged in protected activity but rather was seeking sole-

ly personal gain and had neither the support of his fellow employees nor authority to represent them. "[I]ndividual griping and complaining are not protected concerted activity." *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 717–19 (5th Cir. 1973); *Southwest Latex Corp. v. NLRB*, 426 F.2d 50, 56 n.3 (5th Cir. 1970). "[I]t must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interests of the employees." *Buddies* at 718. Under the facts as found by the Board, Beck, in addition to demanding a lifetime contract for himself, sought improvement of various working conditions for all employees in areas of health benefits, pension rights, wage increases, bonuses and lay-off policy. When management rejected his requests he expressed an intention to discuss the problems with other employees. Before Beck went to the meeting he had discussions, described above, with other employees concerning some of the matters that he later brought up in the meeting. Unlike purely personal complaints in *Buddies* and *Southwest Latex* these were complaints advanced on behalf of all employees though without their express support. They were clearly a predicate for possible group activity, unlike the actions of troublemakers in *Buddies*. The Board's determination that Beck was engaged in concerted activities is supported by substantial evidence and is not inconsistent with Fifth Circuit precedent. The company's arguments to the contrary are essentially attacks on credibility determinations and on inferences drawn by the Board.

The Board order must be enforced insofar as it requires the company to notify employees that it will not forbid union activities, not threaten to discharge (or discharge) employees for union activities and not interfere with or restrain or coerce employees in the exercise of their § 7 rights.

■ The evidence adequately supports the Board's findings of violation of § 8(a)(1) and (3). The Board made out a prima facie case, and the burden shifted to the company to establish that the same action would have been taken in the absence of protected conduct. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB No. 150, 105 LRRM 1169 (1980). Unquestionably Beck had a bad record for tardiness and had been warned about it. He was, however, permitted to make up lost time on Saturdays and Sundays. The Board found that the discharge was not based upon his tardiness. It found that the company had tolerated Beck's attendance problems and had never considered them serious enough to warrant an official reprimand. Moreover at Beck's salary review some six months previously, although tardiness was discussed, Beck was given a raise. Tardiness was not mentioned at the meeting at which Beck was fired.

The Board found that Beck's description of the meeting most accurately described what occurred. No basis is shown for our interfering with this credibility determination. Having made this credibility choice, the Board concluded that Beck's attendance problems were neither the sole reason nor any significant part of the reason for his discharge.

■ Based on its findings the Board correctly found that Beck was entitled to reinstatement. The company asserts that the Board erred in refusing to accept as evidence on the charges of unfair practices an offer of reinstatement that it says was sent to Beck a month after his discharge. This was not error. Reinstatement was not relevant to the unfair practice proceedings except as discussed below with respect to the remedy.

The letter allegedly sent to Beck offering reinstatement, and Beck's reply, are before us only as exhibits tendered but not admitted. In the interest of judicial and administrative efficiency we comment upon them because they may affect further proceedings. The company asserts that the offer of reinstatement was drafted by an NLRB field attorney and, with inconsequential changes, was sent to Beck. This tendered exhibit offers "immediate, full and unconditional reinstatement" without reprisals and with payment of lost pay. The purported

reply by Beck declines to accept unconditional reinstatement and refers to conditions that, in a previous letter, Beck has imposed on his reinstatement.

This passage of correspondence, if proved genuine, affects not only compliance proceedings but the remedy. The remedy ordered by the Board requires the company to post a notice that it will offer Beck immediate and full reinstatement without loss of seniority or other rights and privileges and make him whole for lost earnings. If Beck has been offered reinstatement, as appears likely, and he has refused it, as also appears likely, there is no basis for requiring the company to publicly promise to do what it already has done. Before proceeding with the remedy the Board should settle this issue, and if it finds reinstatement has been offered and refused there should be deleted from the notice required to be posted the reference to offering Beck reinstatement. Also, if reinstatement has been offered and refused, Beck should be entitled to back pay for only the period of approximately one month between the discharge and the reinstatement offer.

The Board order is ENFORCED in part and the case is REMANDED to the Board for further proceedings.