NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DEAUVILLE HOTEL, Respondent.

No. 83–5383.

United States Court of Appeals,
Eleventh Circuit.

Feb. 8, 1985.

Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Ellen A. Farrell, L. Pat Wynns, N.L.R.B., Washington, D.C., for petitioner.

Joel I. Keiler, McLean, Va., for respondent.

Before TJOFLAT and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The principal question presented in this appeal is whether, and, if so, for what period of time, the National Labor Relations Board may suspend enforcement of a no-strike clause in a new collective bargaining agreement following the Union's ratification of the agreement. The Board found

that the employer, the Deauville Hotel, was guilty of an unfair labor practice when it discharged an employee who picketed the hotel three days after the new contract took effect, and it ordered the Deauville to reinstate the employee and recompense him with back pay. Concluding that the no-strike clause provided the employer with just cause for the discharge, we deny the Board's petition to enforce its order. *See* National Labor Relations Act § 10(e), 29 U.S.C. § 160(e) (1982).

## I.

The dispute in this case has its origin in the 1976 Christmas season strike of the luxury hotels along Miami Beach. The collective bargaining agreement between these hotels, including the Deauville, comprising the Southern Florida Hotel & Motel Association (Association)[1] and the Hotel, Motel, and Restaurant and Hi-Rise Employees and Bartenders Union, Local 355 AFL-CIO (Union), representing the employees at the hotels, expired September 16, 1976. Throughout the ensuing Fall, bargaining representatives of the Association and the Union attempted to negotiate a new contract. Their negotiations were unsuccessful, and the Union called a strike commencing December 26, 1976, at the peak of the resort's holiday season. On Friday, January 14, 1977, after three weeks of picketing, the parties agreed on a new contract, and the Union immediately submitted it to the rank and file for ratification. The union

members ratified the contract the same day, and the strike ended.[2]

The new contract called for the strikers to return to work as needed, beginning Monday, January 17, with the exception of those whose jobs had been eliminated. Strikers employed in hotel departments that closed during the strike would be recalled gradually as the hotel operations regained full speed. Most important for purposes of our review, the new collective bargaining agreement retained the explicit no-strike clause[3] of the old contract which prohibited all forms of strikes and picketing.

On January 14, after the rank and file ratified the agreement, the Union and the Association issued a joint statement directing strikers to return to work the following Monday. The statement was carried by the press, radio, and television,[4] and the news that the hotels were recalling employees to resume work spread quickly among the strikers.

At the time of the strike, Flores Demetrio Gonzalez worked as the "head linen man" in the Deauville's linen room. His responsibilities included counting the linen and setting up the linen carts that the housemen used to deliver linen to the hotel rooms. Gonzalez also drove the linen truck to an outside commercial laundry to pick up clean linen as needed. On December 26, 1976, Gonzalez joined his co-workers in the

---

1. The Deauville was a member of the Southern Florida Hotel & Motel Association along with a number of other Miami hotels. The Association represented the Deauville in collective bargaining with the Union during the fall of 1976 and January 1977, and apparently signed the agreement here involved in behalf of the Deauville.

2. The Union signed the contract the next day, January 15; the Association signed it on January 17, at 11:00 a.m. and immediately delivered the document to the Union by messenger.

3. The no-strike clause appears in Article III, Section 2 of the collective bargaining agreement. It reads as follows:

> During the term of this Agreement, the parties are prohibited from resorting to, utilizing,

or in any way effectuating strikes, picketing, lockouts, boycotts (primary and secondary), slow-downs, or any other economic compulsion or sanctions hereinbefore or hereinafter devised for the purpose of compelling their desired objects. This clause shall bar such conduct for alleged or actual unfair labor practices. It is specifically agreed that during the term of this Agreement, neither the UNION nor its members shall have the *right to respect any picket line* established at any EMPLOYER's place of business.

4. The joint statement read: " 'All strikers will be returned to work as the need arises, under normal operating conditions at the hotels occurs [sic], starting immediately.' " *Southern Florida Hotel & Motel Association,* 245 NLRB 561, 580 (1979).

strike and picketed the Deauville until the strike ended on Friday, January 14.

On Monday morning, January 17, Gonzalez returned to work at 7:00 a.m. The atmosphere at the Deauville that first day was somewhat chaotic, as the hotel attempted to reopen some of the departments it had closed and to place the returning strikers in jobs. Nevertheless, Gonzalez resumed his normal work chores that morning, counting, sorting, and stacking linen onto linen carts. The hotel no longer needed him to drive the linen truck to the outside commercial laundry, however, because the hotel had installed its own in-house laundry during the strike. This change reduced Gonzalez' work week from six days to four days.

Gonzalez worked at his linen room job on January 17 until about 12:30 p.m. when his supervisor directed him to run an errand across the street from the hotel. Once outside the hotel, Gonzalez saw about fifteen or twenty of his co-workers picketing on the sidewalk in front of the Deauville. The picketers told Gonzalez that they were striking because they believed the contract had not been signed, employees had been fired, the hotel was not honoring seniority, and the new system of work was not acceptable to them.

Gonzalez returned to his job in the linen room, where, a few minutes later, the Union shop steward entered and explained to him that there was no contract and that it was necessary for the workers to resume the strike. Gonzalez immediately joined the picket line. About two hours later, at 3:00 p.m., the hotel banquet manager spoke to the shop steward, after which the steward told the employees to cease picketing. Gonzalez stopped picketing and, because it was the end of his work day, went home. The Deauville fired Gonzalez the following morning for walking an illegal picket line the day before, in violation of the no-strike clause of the new collective bargaining agreement.

In May 1977, the Deauville rehired Gonzalez as a houseman at lower wages than he earned before. His new duties consisted of cleaning and setting up hotel rooms. Gonzalez was now at the bottom of the seniority list, meaning that work was not always available for him and that he could only choose his days off after the others on the list had chosen.

By the third day on the job, Gonzalez began complaining and protesting about his new job to other employees. His behavior prompted Stephen Delmont, the hotel operations manager, to call Gonzalez into his office. There, Gonzalez explained to Delmont that he was complaining because he was not happy in his new job. Delmont responded that the hotel had done Gonzalez a great favor by giving him that job, and that, if he had any complaints about it, he should go to the Union. He also told Gonzalez that he would be fired immediately if he continued protesting while on the job. Gonzalez apparently heeded Delmont's warning, because he continued working at the Deauville until May 1978, when he was discharged for an unrelated incident which is not relevant here.

On July 26, 1977, the Board issued a complaint based upon Gonzalez' charge that the Deauville had committed unfair labor practices. The first alleged unfair labor practice was that the Deauville had violated sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) and (1) (1982),[5] when, on Janu-

---

5. 29 U.S.C. § 158 (1982) reads in pertinent part:
§ 158. Unfair labor practices
(a) Unfair labor practices by employer
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
. . . .
Section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1982) describes protected activity. It says:
§ 157. Right of employees as to organization, collective bargaining, etc.

ary 18, 1977, it fired Gonzalez for engaging in protected union activity (lawful picketing on the afternoon of January 17) and when, in May, it reinstated him to a position of lesser status than the one he occupied at the time of his discharge. The Board upheld this allegation, finding that, even though the picketing was technically in violation of a no-strike clause, the picketing was nevertheless lawful because the no-strike clause was inoperative at the time.[6] In the Board's view, following a three-week strike " 'a period of time was needed for the air to clear and the dust to settle' " before the provision could become operative. *Deauville Hotel,* 256 N.L.R.B. 561, 564 (1981) (citing *Southern Florida Hotel & Motel Association,* 245 N.L.R.B. 561, 606 (1979) ).

The second unfair labor practice concerned Delmont's May 1977 reprimand of Gonzalez. The Board held that Delmont's reprimand (issued in behalf of the Deauville) violated section 8(a)(1)[7] of the Act because Delmont had threatened to discharge an employee for complaining about working conditions. Though the Board failed to explain the basis of its holding, we perceive two possible theories to support

its conclusion. The first is that Gonzalez, having been the victim of an unfair labor practice, was entitled to complain about his employer's failure to reinstate him to his former position as part of the hotel's remedy of its January 17, 1977 unfair labor practice and that such a complaint would be protected. The second is that Gonzalez, irrespective of the unfair labor practice, had engaged in protected activity simply by complaining to his co-workers about working conditions. The validity of the first of these theories depends upon the Deauville's right to enforce the no-strike clause after Gonzalez picketed the hotel on the afternoon of January 17. The second theory does not, the sole question being whether, standing alone, Gonzalez' complaints about working conditions constituted protected activity.

## II.

The threshold issue in this case is: how soon after a collective bargaining agreement is made can the employer enforce the no-strike clause? The Board holds that the clause is not operative until a period of

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

6. The administrative law judge adopted the legal holding announced by the Board in *Southern Florida Hotel & Motel Association,* 245 N.L.R.B. 561 (1979). That hotly litigated case involved four other Association members and their relationship with the Union and its members during the fall of 1976 and in January 1977. The administrative law judge, in his decision, noted that in the *Association* case the Board found the hotels guilty of many violations of sections 8(a)(1) and (3) of the National Labor Relations Act, which included the discharge of employees for picketing on January 17, 1977 following the adoption of the new collective bargaining agreement containing the no-strike provision.

The administrative law judge said that because the *Association* case involved the same strike, the same union, and the same contract, the "circumstances were the same" as in the Deauville case. The record in this case reveals no similarities between the *Association* case and this case other than those already mentioned. The administrative law judge admitted that, in the *Association* case, some returning strikers were not permitted to work and others who were admitted to work were refused seniority. He attempted to create the same circumstances at the Deauville, relying on the hearsay statements made by picketers to Gonzalez on January 17, 1977, which were admitted into evidence solely to show Gonzalez' mental state at the time he walked off the job and not for the truth of the matter asserted. The administrative law judge improperly used this hearsay evidence for the truth of the matter asserted in an attempt to establish "similar circumstances." We find no evidence in the record establishing that the Deauville was guilty of any misconduct or anti-union animus toward Gonzalez.

7. *See supra* note 5.

time has passed to permit "the air to clear and the dust to settle." *Id.* The Deauville contends that the clause is operative the moment the labor contract becomes effective and that the Board's holding does violence to the nation's labor policy. We conclude that the Board's "air to clear—dust to settle rule" ("the Board's rule") cannot, as articulated, be squared with the national labor policy that favors no-strike clauses. We also conclude that Gonzalez' picketing on the afternoon of January 17, 1977, which was the cause of his firing, took place well after the labor contract in this case became effective and that whatever reasonable time the Union may have needed to communicate this fact (and that the contract contained a no-strike clause) to the rank and file had passed.

 In urging us to support its holding in this case, the Board quite properly reminds us that, traditionally, we accord considerable deference to its expertise in applying the National Labor Relations Act to the labor controversies that come before it and that its interpretation of the Act is entitled to weight. *NLRB v. Denver Building and Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951); *NLRB v. Southwestern Bell Telephone Co.,* 694 F.2d 974, 976 (5th Cir.1982). Nevertheless, Congress did not intend that we abdicate our judicial function and merely rubberstamp the Board's rulings. *Omni International Hotels, Inc. v. NLRB,* 606 F.2d 570, 573 (5th Cir.1979); *see Hi-Craft Clothing Co. v. NLRB,* 660 F.2d 910, 915 (3d Cir.1981). We must examine its decisions to ensure that its statutory interpretation has a reasonable basis in law, *see NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *GAF Corporation v. NLRB,* 524 F.2d 492, 495 (5th Cir.1975), and that a reasonable balance has been struck between competing policies. *See NLRB v. Brown,* 380 U.S. 278, 290–91, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *GAF Corporation,* 524 F.2d at 495. In carrying out the specific task presented to us here, assessing a Board decision that allegedly rests upon an " 'erroneous legal

foundation,' " *NLRB v. Brown,* 380 U.S. at 292, 85 S.Ct. at 988 (quoting *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956)), we heed the directive of the Supreme Court:

> Reviewing courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions .... "[W]here ... the review is not a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.' "

*NLRB v. Brown,* 380 U.S. at 291–92, 85 S.Ct. at 988, (quoting *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).

With the Supreme Court's *Brown* directive in mind, we turn to the question the Deauville raises: whether the Board's suspension of the no-strike clause in the circumstances of this case violated national labor policy. To answer this question, we must examine the policies the no-strike clause serves and assess the effect of the Board's holding on those policies.

 The no-strike clause encourages collective bargaining and promotes the peaceful resolution of labor-management conflicts. *See Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 105, 82 S.Ct. 571, 578, 7 L.Ed.2d 593 (1962); *Fournelle v. NLRB,* 670 F.2d 331, 336 (D.C.Cir.1982). This clause is often at the very center of the bargaining process. An employer may be willing to pay a considerable price—in terms of higher wages and fringe benefits, for example—for a no-strike clause, especially if it is important that its plant and

equipment remain operating and productive throughout the life of the contract.[8] The giving of a covenant not to strike may be just as important to the Union, particularly in cases in which the acquisition of a new benefit is a substantial issue with the rank and file. *See NLRB v. Magnavox Company of Tennessee*, 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974) (a union may agree to a no-strike clause in return for a grievance and arbitration procedure); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (a union may waive its members' right to strike in return for economic benefits for employees). And when the majority of the Union membership is willing to give up their right to strike for a *quid pro quo* and ratifies a contract with a no-strike clause, the contract, and clause, is binding on every member, even those who did not "agree" to give up their right to strike. *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006–07, 18 L.Ed.2d 1123 (1967); *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951, 960–61 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976).[9] In addition to fostering the peaceful resolution of labor-management conflicts, no-strike clauses enhance the flow of the nation's commerce by ensuring that plant and equipment, the means of transporting goods, and the provision of services remain in operation and on schedule. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356–57, 100 L.Ed. 309 (1956); *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 460 (3d Cir.1981).

■ The rule the Board has fashioned in this case would curtail the utilization of no-strike clauses because it would seriously impair their enforceability and cause considerable unrest. Several observations make this clear. First, the Board's rule has no parameters; how is an employer or employee to know when the air has cleared and the dust has settled following the making of a new labor contract? Is the clause inoperative only with respect to those picketing employees who do not know that the no-strike clause is in force? Or is it inoperative with respect to all employees until all or substantially all of them have notice? If so, those who picket with knowledge of the clause can do so with impunity.

Without a clear understanding of how long and as to whom the no-strike clause is operative, an employer would be taking a substantial risk in discharging a picketing employee whom it thought was picketing in defiance of his covenant not to strike. The employer could, as here, be charged with committing an unfair labor practice. Considering the expense—in terms of money, resources, and unrest in the work place—of defending an unfair labor practice charge, the employer, under these circumstances, may deem a no-strike clause to be of little benefit; moreover, both it and the Union would assign the clause even less value at a later bargaining session. Of course, a counter argument could be made to the effect that the clause still might have significant value, since it would become operative and enforceable at some future date. This may be so, but the fact remains that, under the Board's rule, substantial mis-

---

8. "'[T]he chief advantage which an employer can reasonably expect from a collective bargaining agreement is assurance of uninterrupted operating during the term of the agreement.'" *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951, 960 (3d Cir.1975) (quoting S.Rep. No. 105, 80th Cong., 1st Sess. 16 (1947)), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). *See also United Electrical, Radio & Machine Workers of America v. NLRB*, 223 F.2d 338, 341 (D.C.Cir.1955), *cert. denied*, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956).

9. Courts consistently hold that strikes violating no-strike clauses are not protected by the National Labor Relations Act and that the discharge of employees who engage in such strikes is not an unfair labor practice. *NLRB v. City Disposal Systems, Inc.*, — U.S. —, —, 104 S.Ct. 1505, 1514, 79 L.Ed.2d 839 (1984); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *Kaufman and Broad Home Systems, Inc. v. International Brotherhood of Firemen and Oilers*, 607 F.2d 1104 (5th Cir.1979); *NLRB v. Dorsey Trailers, Inc.*, 179 F.2d 589, 592 (5th Cir.1950).

chief could occur at a very critical time, like it did in this case, when the parties are striving to conclude a period of bitter unrest.

■ The Deauville suggests that the only alternative to the Board's rule is to make the no-strike clause operative the moment the collective bargaining agreement takes effect; in other words, the labor law cannot, consistent with the policies it seeks to implement, accommodate a brief period in which those in the work force, employees and supervisors alike, can be informed that a new contract has been signed and the strike is over. We disagree. We think it well within the Board's judgment and expertise to conclude that there must be a reasonable period of time to allow the parties most affected by the contract to be informed. What constitutes a reasonable time, however, can be more objectively and definitively stated than the Board has in its new rule.

■ First, to avoid the subjective state-of-mind inquiry the Board's rule calls for, i.e., whether the rank and file and/or the picketing employee knew that the union and management had a new contract with a no-strike clause, we would espouse an objective standard that would ask, for example, whether a reasonable time had passed for the employees to know that a bargain had been reached. Under this standard, one would take into account such factors as whether the strike was local or national in nature; the proximity of the union to its members; the ability of the union to communicate with its members; whether a no-strike clause existed under the old contract;

whether to incorporate the clause into the new contract was a point of controversy; the extent to which the rank and file were exposed to the terms of the new collective bargaining agreement during the negotiation and ratification process; and the period of time between the effective date of the agreement and the picketing.

An objective approach such as this would be more workable because it substitutes facts which are easily susceptible of proof for subjective, self-serving statements. The parties to the collective bargaining agreement should be better able to assess whether sufficient time has passed to render the no-strike clause enforceable and to act accordingly. An objective test serves established labor policy by preserving the efficacy of the no-strike clause while, at the same time, permitting fair treatment of everyone involved.

An objective standard such as the one we have articulated above comes about as close to describing the reasonable time the Board considers necessary as we think the labor law would allow. Using this standard, we review the facts, as found by the Board, to determine whether the Union had a reasonable time, prior to Gonzalez' picketing on January 17, 1977, to notify the rank and file that a contract containing a no-strike clause had been reached with the Deauville.

■ The parties' negotiators drew a final draft of their collective bargaining agreement on Friday, January 14, 1977. The Union submitted this draft to the rank and file for ratification the same day. They approved the contract immediately,[10] and

---

10. The union members' ratification of the agreement was the last act necessary in this case to create a meeting of the minds and an enforceable agreement. To hold otherwise would mean that the act of ratification constituted a counter offer from the Union to the Association which the Association could decline to accept. To allow the Association to do so in these circumstances would be contrary to established labor law. Cf. *H.J. Heinz Co. v. NLRB,* 311 U.S. 514, 525–26, 61 S.Ct. 320, 325–26, 85 L.Ed. 309 (1941) (employer's refusal to sign a collective bargaining agreement is an unfair labor practice; having reached agreement, employer can-

not refuse to sign it). Consequently, that the Union and Association officials who were to sign the contract document did not actually do so until January 15 and January 17, respectively, *see supra* note 2, is irrelevant. Their act of signing the document was nothing more than ministerial. Cf. *Trustees of the Atlanta Iron-workers v. Southern Stress Wire Corp.,* 724 F.2d 1458, 1459 (11th Cir.1983) (courts are flexible when determining when an enforceable labor contract exists); *Capitol-Husting Co. v. NLRB,* 671 F.2d 237, 242 (7th Cir.1982) (federal courts are flexible when applying contract law in the field of labor relations in order to effectuate the

the Union and Association made a joint statement to the media, indicating that all strikers would be returning to work beginning Monday, January 17. It is undisputed that everyone knew that the new contract carried forward the no-strike clause of the old agreement.

The Deauville promptly notified striking employees to report to work that Monday. Gonzalez received the message and, as we have indicated, clocked in at 7:00 a.m. He plainly knew that a new labor contract was in force and that the strike had been settled. He also knew that he no longer had the right to strike. Gonzalez joined the picket line on the afternoon of January 17 because the Union's shop steward told him to do so. Apparently, the steward mistakenly thought the new collective bargaining agreement had somehow collapsed.[11] He was in error, and, unfortunately, Gonzalez must suffer the consequences.

██ When a union agrees to a no-strike clause in a collective bargaining agreement, it assumes an obligation to heed the provision and, moreover, pledges to employ every reasonable means to prevent and to terminate any unlawful work stoppages. *Eazor Express*, 520 F.2d at 964; *Airco Speer Carbon-Graphite v. Local 502, International Union of Electrical, Radio & Machine Workers of America*, 479 F.Supp. 246, 254 (W.D.Pa.1979). Here, there is nothing in the record even remotely suggesting that the Deauville reneged in any way on its agreement with the Union and the strikers or somehow caused the work stoppage on the afternoon of January 17. A misguided shop steward, and thus the Union, created the stoppage. Under these circumstances, neither the Union nor Gon-

zalez was excused from honoring the no-strike clause.

██ In summary, we hold, as a matter of law on the facts the Board has found, that the Union had reasonable time to notify its members, including Gonzalez, about the new contract and no-strike clause. The Deauville therefore had the right to discharge Gonzalez for picketing. The hotel, having discharged Gonzalez solely for that reason, did not violate sections 8(a)(1) and (3) of the Act on January 18, the date of Gonzalez' discharge, or the following May, when it rehired him to a less desirable job.

### III.

Crediting Gonzalez' rendition of his May 1977 encounter with his supervisor, the Board held that the Deauville violated section 8(a)(1) of the National Labor Relations Act for threatening to discharge Gonzalez in May 1977 if he continued to complain because the Deauville had not restored him to the position he occupied in the linen room before the strike. The Board based its holding primarily on the fact that Gonzalez protested frequently to his co-employees about the working conditions of the new job, houseman, the Deauville had given him and that Delmont, in response, warned him that, if he persisted, he would be fired. The Board did not, however, explain how reprimanding an employee because he complains about his job conditions constitutes, in and of itself, an unfair labor practice.

██ In Part I, *supra*, we suggested that the Board predicated its holding on one of two theories. The first is that Gonzalez had a right to complain about the hotel's failure to reinstate him properly to

policies underlying federal labor law); *Certified Corp. v. Hawaii Teamsters and Allied Workers*, 597 F.2d 1269, 1271 (9th Cir.1979) (courts will enforce an oral modification to a labor contract notwithstanding express provision to the contrary); *NLRB v. New York-Keansburg-Long Branch Bus Co.*, 578 F.2d 472, 476–77 (3d Cir. 1978) (a labor contract may be binding upon the parties when they have agreed to substantive terms and conditions even before it is reduced to writing); *Warrior Constructors, Inc. v. Inter-*

*national Union of Operating Engineers*, 383 F.2d 700, 708 (5th Cir.1967) (whether a contract takes effect before a contemplated writing is executed depends on the intentions of the parties).

11. The steward did not testify before the administrative law judge and, consequently, the record does not indicate what led him to request Gonzalez to join the picket line.

his former position in the linen room. Our holding in Part II, *supra,* disposes of this theory. The Deauville was not obligated to Gonzalez in any way following his lawful discharge in January 1977; therefore, it was free in May to refuse to place Gonzalez in his old job and to rehire him to a lesser position.

 The second possible theory for the Board's holding, that complaining about working conditions is a protected activity, also fails. The notion that an employer cannot reprimand an employee for griping and complaining about his job and threaten discharge if the protesting does not stop is contrary to the law of this circuit. Purely personal griping and complaining about working conditions is not an activity protected by section 7 of the National Labor Relations Act, 29 U.S.C. § 157.[12] *Enerhaul, Inc. v. NLRB,* 710 F.2d 748, 751 (11th Cir.1983); *NLRB v. Charles H. McCauley Associates, Inc.,* 657 F.2d 685, 688 (5th Cir.1981);[13] *NLRB v. Datapoint Corp.,* 642 F.2d 123, 128 (5th Cir.1981); *NLRB v. Buddies Supermarkets, Inc.,* 481 F.2d 714, 717 (5th Cir.1973); *Southwest Latex Corp. v. NLRB,* 426 F.2d 50, 56 n. 3 (5th Cir.1970). "[I]t must appear at the very least that it [griping and complaining] was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interests of the employees.'" *Enerhaul,* 710 F.2d at 751 (quoting *Buddies Supermarkets,* 481 F.2d at 718). Because griping is not a protected activity, a complaining and disgruntled employee may be fired for his conduct. *See Enerhaul,* 710 F.2d at 751; *Datapoint,* 642 F.2d at 129. Here, there is no indication that Gonzalez was attempting to initiate group action; rather, he was merely demonstrating a bad attitude about his job and disrupting the work place with his personal gripes. Delmont was justified in reprimanding Gonzalez and even in threatening to fire him if he did not change his attitude.

12. *See supra* note 5.

13. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court

There was no basis in law or fact for concluding that the Deauville committed an unfair labor practice in this instance.

For the reasons we advance above, enforcement of the order of the National Labor Relations Board is

DENIED.

adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.