751 F.2d 1571
 118 L.R.R.M. (BNA) 2792, 102 Lab.Cas. P 11,339
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
Hotel, Motel, Restaurant & Hi-Rise Employees and Bartenders
Union, Local 355, AFL-CIO, Intervenors,
v.
SOUTHERN FLORIDA HOTEL AND MOTEL ASSOCIATION and Its
Employer Members, the Estate of Alfred Kaskel,
etc., et al., Beau R. Corp., etc., Respondents.
 No. 83-5452.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 8, 1985.
 
 Elliott Moore, Deputy Associate General Counsel, Barbara A. Atkin, N.L.R.B., Washington, D.C., for petitioner.
 
 
 1
 Joseph H. Kaplan, Kaplan, Sicking, Hessen, Sugarman, Rosenthal & De Castro, Miami, Fla., for Hotel, Motel, Restaurant & Hi-Rise Employees & Bartenders Union, Local 355, AFL-CIO.
 
 
 2
 Joel I. Keiler, McLean, Va., for Southern & Beau.
 
 
 3
 Finley, Kumble, Wagner, Heine, Underberg & Casey, Carl A. Schwarz, Jr., New York City, for Estate of Kaskel, et al.
 
 
 4
 Application for Enforcement of an Order of the National Labor Relations Board.
 
 
 5
 Before TJOFLAT and JOHNSON, Circuit Judges and TUTTLE, Senior Circuit Judge.
 
 TJOFLAT, Circuit Judge:
 
 6
 On Christmas Day in 1976, the Hotel, Motel, Restaurant and Hi-Rise Employees and Bartenders Union, Local 355, AFL-CIO (Union) called a strike and established picket lines at several Miami Beach hotels. The Union's collective bargaining agreement with the hotels had expired on September 26, 1976, and contract negotiations between the Union and the hotels' bargaining representative, Southern Florida Hotel & Motel Association (Association), had collapsed. The parties soon reached an accord, however, and the strike was called off on January 14, 1977, when the Union members ratified the new contract.
 
 
 7
 On January 17, after many of the strikers had returned to work, several Union employees began to picket one of the hotels, the Doral Beach Hotel, and the hotel, invoking the contract's no-strike clause, fired them.[1] Between January 20 and 22, three hotels, the Doral Beach Hotel, the Doral Hotel and Country Club, and the Carillon (which, because they were under common management, will sometimes be referred to collectively as the "Doral" or the "Doral hotels"), purportedly relying on a contract provision that entitled them to terminate "unqualified" employees regardless of seniority when reducing the hotels' work force, laid off over 200 returning strikers. The Beau Rivage Hotel[2] also discharged one returning striker, a bartender, for being "unqualified" and refused to reinstate three breakfast waitresses because their positions had been terminated during the strike.
 
 
 8
 The Union, contending that the hotels' conduct was motivated by anti-union animus, brought several unfair labor practice charges against these hotels and the Association. After extensive hearings, the National Labor Relations Board concluded that the respondent hotels and the Association had violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act, as amended, 29 U.S.C. Sec. 158(a)(1), (3), and (5) (1982).[3] The Board ordered the Association and the hotels to cease and desist from such conduct. The Board further ordered the hotels to offer unconditional reinstatement to those employees whom they unlawfully discharged and to make them whole for any loss of wages. Southern Florida Hotel & Motel Association, 245 N.L.R.B. 561 (1979). The Board now seeks enforcement of its order.
 
 
 9
 We uphold the Board's determination that the Doral hotels violated the Act by discharging the returning strikers because they supported the strike and that the hotels' justification that they had a contract right to discharge these strikers was pretextual. In a similar manner, we uphold the Board's decision that the Beau Rivage violated the Act by terminating one returning striker, the bartender, for being "unqualified." We set aside the Board's determination, as not supported by substantial evidence, that the Doral Beach Hotel violated the Act by discharging the post-strike picketers and that the Beau Rivage did likewise by not reinstating the three breakfast waitresses.
 
 I.
 A.
 
 10
 The Union's Christmas strike received broad support from the employees at the respondent hotels; most of them walked out immediately.[4] The hotels succeeded in replacing about half of the strikers and continued operating, although some of their services were curtailed. On December 30, the parties resumed their contract negotiations. Both sides desired a quick settlement, not wishing to lose the benefits of the profitable mid-winter season.
 
 
 11
 During the negotiations, the parties used their expired contract as the basis for negotiating a new collective bargaining agreement. The major problem they faced was how to reduce the oversized work force that would result when the strikers returned to work and were added to the nonstrikers and the newly-hired replacements. Joel Gray, an executive vice president of the Doral hotels and president of the Association, told the Union negotiators that the hotels felt that many of the replacements hired during the strike were far better employees than some of the strikers and that the hotels wanted to terminate these strikers under a provision, drawn from the expired collective bargaining agreement, which would authorize the employer, in reducing its work force "due to reduction in business," to lay off "unqualified" employees.[5] The Union, sensing that only Union members would be deemed unqualified, insisted that all the strikers return to work and that the hotels discharge the replacements. The Union, accordingly, opposed the inclusion of the layoff provision in the new contract. The Association's negotiators ultimately gave in. If the Union would agree to the retention of the layoff provision, the hotels would agree that all of the strikers could return to work; if any employees were laid off, they would be the replacements. There would be only one exception to this policy: the hotels could refuse to reemploy a striker whose position had been abolished. This arrangement was acceptable to the Union, and it agreed to a draft contract which included the layoff provision.
 
 
 12
 On Thursday, January 13, the parties, having resolved their reduction-in-force problem, agreed to the terms of a collective bargaining agreement, and the Union officials promised to recommend it to the membership for ratification. The next day, the Union rank and file ratified the agreement, and the parties announced to the public, by radio, television, and newspaper, that they had settled their dispute and that the strike was over. Their announcement said that the strikers would begin returning to work on Monday, January 17.
 
 B.
 
 13
 The Doral Beach Hotel, the Doral Hotel and Country Club, and the Carillon were, as we have indicated, under common ownership and management. During the strike, numerous supervisors at the three Doral hotels made comments evidencing anti-union animus to other supervisors and pro-management employees. For example, they said "there's not going to be any more union here"; "whoever walks out won't be back"; and "the Union really messed things up for themselves with the strike, and now the hotel is going to give it to them."
 
 
 14
 After the strike was settled but before the strikers returned to work, Joel Keiler, the Association's lawyer, spoke to a large meeting of the Doral hotels' supervisors and department heads. The lawyer told the group that the strike was over and that an agreement had been reached. He felt management had won the strike, but they were not going to broadcast that because the Union was still there and it had to "save face." He explained that, under the new contract, the hotels had to take back all of the strikers. Disregarding the Association's promise to the Union, however, he went on to say that, once the strikers were reinstated, the hotels could reduce the expanded work force by laying off anyone, returning strikers and replacements alike, whom they regarded as inefficient, unqualified, or "dead wood." Each department head would be asked to prepare a list of those "unqualified" for their position; all unqualified strikers would be laid off and the unqualified replacements would be fired. The lawyer also instructed the supervisors not to be vindictive and not to consider Union membership or activity, or their personal feelings toward an employee, in determining who was unqualified.
 
 
 15
 Lee Levine, the Doral hotels' personnel director, also addressed the group. He, too, ignored the Association's promise not to lay off returning strikers as unqualified and told the group that the overstaffing would be handled by laying off the unqualified returning strikers and firing the unqualified replacements. He reiterated that the supervisors should not put an employee on the unqualified list because he had engaged in Union activity. But Levine never intended that the supervisors follow his warning. Levine's hostility toward the strikers and the Union colored the delivery of his instructions to the supervisors, leading them to believe that he wanted them to consider "unqualified" the strongest Union supporters, to teach the employees a lesson and discredit the Union.
 
 
 16
 On Monday, January 17, the Doral hotels began to call the strikers back to work; by January 21, all were on the job. The reinstatement process did not go smoothly. Many Doral managers told the returning strikers that the Union had sold them out and that the management could now discharge whomever it chose without regard to seniority.
 
 
 17
 On the first day of the reinstatement process, hundreds of former strikers reported for work under the mistaken impression that they were to return to work immediately. Hotel security guards turned away those who were not scheduled to work, advising them that they should contact their supervisors by telephone. This angered those whose work was being done by replacements, and they set out to cause trouble. A number of them went to the Union hiring hall seeking an explanation as to why they could not return to work immediately. Receiving no satisfactory explanation, they returned to the Doral Beach Hotel and picketed with signs stating that the Union was striking the hotel for better wages and working conditions. The hotel dismissed thirty-six of the picketers for violating the collective bargaining agreement's no-strike clause.[6]
 
 
 18
 By January 20, the supervisors at the Doral hotels had made up their lists of the employees, former strikers and replacements, who were to be laid off as unqualified or fired and submitted them to the hotel management. The Doral supervisors, at senior management's behest, automatically labeled unqualified many of those who had supported the Union's bargaining effort. No one had previously complained about the performance of the vast majority of those labeled unqualified. In fact, the Doral management neither consulted the hotels' personnel records nor made any other investigation in reaching these decisions. Many strikers labeled unqualified had worked for the Doral hotels for over ten years. Their only shortcoming was supporting the Union during the strike.
 
 
 19
 The Doral hotels laid off almost everyone the supervisors put on their lists, thereby breaking the Association's promise to the Union. They laid off 216, or seventeen percent, of the 1,239 recalled strikers and dismissed 321, or fifty-three percent, of the 607 replacements.[7]C.
 
 
 20
 The workers at the Beau Rivage delayed their strike, waiting until January 11 to walk off the job. The day before, the hotel's top managers called a meeting of the employees to discuss the strike. They offered rooms to those employees who wished to work during the strike but did not want to cross the picket lines. Management reminded the employees that the hotel would pay for their benefits and that they would continue to receive them even if they chose not to belong to the Union. They also explained that the hotel would hire replacements for those who struck and that their jobs might not be available if they wished to return.
 
 
 21
 Most of the hotel's employees, approximately thirty, participated in the strike and picketed until the Union rank and file ratified the new collective bargaining agreement on January 14. During the strike, top management visited the picket line and on one occasion provided coffee to the strikers because the weather was very cold.
 
 
 22
 As the strike at the Beau Rivage progressed, the hotel, being short-handed in the dining room, converted the breakfast and lunch table service to a buffet and thus eliminated the need for the three waitresses who had joined the strike. Consequently, replacements were not hired for their jobs. Management was so pleased with the buffet service that it was continued after the strike. When the three striking waitresses returned for work on January 17, the hotel refused to reinstate them, because their jobs had been permanently eliminated.
 
 
 23
 Frank Marcucci worked for the Beau Rivage for thirteen years prior to the strike. During that period he was never reprimanded and his work was never criticized. Marcucci was the only one of the hotel's three bartenders who struck, and the hotel immediately hired a replacement for him. On January 18, Marcucci asked to be returned to his job. The hotel refused because, it said, it had no need of his services. Marcucci complained to the Union, and the hotel promptly recalled him. Three days later he was laid off.[8] Later, in explaining the hotel's decision to the Board, one Beau Rivage manager stated that Marcucci was "not qualified," and a second stated that he had a sullen attitude, was rude to the customers, and could not get along with his co-workers. The other strikers at the Beau Rivage returned to work without incident.
 
 D.
 
 24
 After extensive hearings, the Board concluded that the Doral hotels' discharge of the post-strike pickets on January 17 and the layoff of returning strikers for being unqualified discriminated against them for their support of the Union and therefore constituted unfair labor practices proscribed by sections 8(a)(3) and (1) of the Act. 29 U.S.C. Sec. 158(a)(3) and (1) (1982).[9] The Board determined that the Beau Rivage engaged in unfair labor practices by refusing to reinstate the three striking breakfast waitresses and by laying off Frank Marcucci, the bartender, because they went out on strike. The Board ordered the hotels and Association to cease and desist any further involvement in the unfair labor practices found and ordered each hotel, severally, to offer immediate, full, and unconditional reinstatement to those employees who were discriminated against and to make each of them whole for any loss of wages they suffered.
 
 II.
 
 25
 In resisting the Board's petition for enforcement, the respondent hotels contend that the findings of fact underpinning the Board's decision are not supported by substantial evidence in the record as a whole, and accordingly we must reject the Board's petition for enforcement. The Doral hotels alternatively contend that the Board erred as a matter of law in not holding the Association jointly liable with them for the back pay of the laid off strikers. For ease of discussion, we consider the Doral hotels' arguments first; those of the Beau Rivage follow.[10]
 
 
 26
 Our standard for reviewing the Board's findings of fact is well settled, yet worthy of restatement. We will enforce the Board's order whenever we can "conscientiously find that the evidence supporting the decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); see also 29 U.S.C. Sec. 160(e) (1982). We never "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." Universal Camera, 340 U.S. at 488, 71 S.Ct. at 465. Furthermore, we recognize that the Board is "presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which [we] do not possess and therefore must respect." Id.
 
 A.
 1.
 
 27
 The Board found that the Doral hotels' layoffs of the returning strikers as unqualified was motivated by their desire to hurt the Union. The record is replete with evidence of anti-union animus on the part of the hotels' management throughout the strike and after the strikers were initially reinstated. During the strike the Doral supervisors repeatedly said that they would put the Union out of business and later told the strikers, on returning to work, that the Union had sold out its members and could no longer protect them. Nevertheless, the hotels now say that the collective bargaining agreement entitled them to reduce their oversized work force by singling out the unqualified strikers and laying them off. The hotels contend that they were entitled to do so, and thus were immune to an unfair labor practice charge, because they had a permissible business justification to invoke the contract's layoff provision.
 
 
 28
 A section 8(a)(3) violation is established when it is shown, by a preponderance of the evidence, that the employer's anti-union animus was a substantial or motivating factor in its decision to discharge an employee. The employer may, however, avoid such a showing by establishing, as an affirmative defense, that the discharge would have occurred in any event and for valid reasons. The employer must prove this affirmative defense by a preponderance of the evidence. NLRB v. Transportation Management Corp., 462 U.S. 393, ----, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983); Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).[11]
 
 
 29
 We agree with the Board that the Doral's anti-union animus contributed to the layoffs of the returning strikers. The Doral's explanation that they had a contract right to lay them off failed to satisfy the Board. The question we must decide is whether the Board's rejection of the Doral's explanation was supported by substantial evidence.
 
 
 30
 The situation here is somewhat akin to fraud in the inducement. The Association's representation that the hotels would not retaliate against the returning strikers by invoking their contract right to lay off unqualified employees[12] induced the Union, on January 13, 1977, to approve the final draft of the collective bargaining agreement and to recommend it to the rank and file for ratification the next day. The Association knew that, with this promise in hand, the Union would make that recommendation and that the strikers would accept it, ratify the contract, and return to work. The Association also knew that, if the hotels thereafter invoked the layoff provision to discharge returning strikers, the result might well be catastrophic for the Union: the rank and file would conclude that the Union had sold them down the river and would challenge the Union's leadership. Once the hotels began to lay off the returning strikers, this is precisely what occurred: the Union's leadership weakened and the Union's effectiveness with the rank and file was essentially destroyed. The Doral supervisors' numerous comments to Union members that their leaders had sold them out contributed to the damage.
 
 
 31
 The evidence clearly authorized the Board to reject the Doral's affirmative defense that they invoked the contract layoff provision for legitimate and substantial business purposes and that, regardless of anti-union sentiment, the discharged returning strikers would have been laid off anyway. The evidence established that the Doral hotels made no attempt whatever to determine which employees were unqualified; management's strongly implied instruction to its supervisors was to get rid of the stronger Union supporters. The Doral hotels' purported invocation of the contract right, the Board could, and did, conclude, was a mere pretext.
 
 2.
 
 32
 The Board determined that an employer commits an unfair labor practice when it enforces a no-strike clause immediately after a collective bargaining agreement goes into effect. It reasoned that the immediate enforcement of a no-strike clause is unfair to the employees who might either be unaware that an agreement has been reached or remain antagonistic toward their employer. Thus, the employer must accord its employees a period of time "for the air to clear and the dust to settle." During this cooling-off period, the workers may disregard their no-strike covenant with impunity. Drawing on this rationale, the Board held that the Doral hotels violated the Act by discharging thirty-six employees who began to picket three days after the Union membership ratified the new contract and the strike had terminated. The Doral hotels challenge this holding, contending that it trammels important national labor policies no-strike clauses serve to implement.[13]
 
 
 33
 We entertained this same contention in a companion case arising out of the Union's Christmas strike of the Miami Beach hotels. See NLRB v. Deauville, 751 F.2d 1562 (11th Cir.1985). In that case, as here, the Board held it an unfair labor practice when the hotel discharged an employee who picketed on January 17, after the collective bargaining agreement had been made and the strike had ended. We concluded, in Deauville, that the Board's cooling-off rule was too indefinite and would seriously impair the future role of no-strike clauses in labor-management relations. We did, however, hold that the Board, in the exercise of its expertise in the labor relations field, was authorized to conclude that a reasonable time was necessary, following the making of a collective bargaining agreement, "to allow [those] most affected by the contract to be informed" that the parties have reached an accord, incorporating a no-strike clause, and that the strike had ended. But contrary to the Board's approach, we held that this reasonable period had to be determined by an objective standard rather than the subjective test the Board's rule involves. An objective standard would consider, for example:
 
 
 34
 whether a reasonable time had passed for the employees to know that a bargain had been reached. Under this standard, one would take into account such factors as whether the strike was local or national in nature; the proximity of the union to its members; the ability of the union to communicate with its members; whether a no-strike clause existed under the old contract; whether to incorporate the clause into the new contract was a point of controversy; the extent to which the rank and file were exposed to the terms of the new collective bargaining agreement during the negotiation and ratification process; and the period of time between the effective date of the agreement and the picketing.
 
 
 35
 NLRB v. Deauville, 751 F.2d 1562, 1579-80 (11th Cir.1985).
 
 
 36
 Utilizing this test as we did in Deauville, we conclude that a reasonable time had passed after the contract was made in this case for the Union to notify the rank and file that it had a collective bargaining agreement and that the strike was over. A substantial portion of the Union's membership had participated in the contract ratification process on Friday, January 14, 1977. The moment ratification was an accomplished fact,[14] there was widespread publicity in the Miami community that the strike was over and that everyone would begin returning to work the following Monday. Moreover, there was no doubt in anyone's mind that the new contract carried forward the no-strike clause of the old agreement.
 
 
 37
 The Union must bear a lion's share of the blame for the post-strike picketing in this case. When the unsatisfied Doral workers came to the Union's hiring hall on January 17, having been told that they could not return to work until their supervisors scheduled them, and talked themselves into picketing the Doral Beach Hotel, the Union's officials, who were present, could have stopped them. These officials had ample opportunity to do so and to warn those who had gathered that, if they picketed the hotel, they would violate the collective bargaining agreement and would be subject to discharge. They apparently did nothing, however, except observe some of the workers collecting a few picketing signs and departing.
 
 
 38
 The Board erred in declaring that the Doral hotels could not enforce their no-strike clause by discharging the picketers on January 17, almost three days after reaching the new collective bargaining agreement. As the Board acknowledged, the Doral's action in enforcing the clause was not prompted by anti-union animus. We therefore decline to enforce the portion of the Board's order dealing with the discharge of the thirty-six picketers at the Doral Beach Hotel.
 
 3.
 
 39
 The Board ordered each of the hotels to offer immediate, full reinstatement to those strikers discharged as a result of the unfair labor practices it found and to make them whole for any loss of wages. The Doral hotels contend that the Association must share its responsibility for providing back pay to these workers.
 
 
 40
 The Doral hotels suggest that the Association should share this responsibility because, as the Board found, the Association's lawyer incorrectly told them that they were entitled to lay off any employee they regarded as unqualified. They overlook, however, the Board's finding that it was they, not the Association, who demonstrated the pervasive anti-union attitude that underscored their selection of those to be labeled "unqualified." The Doral hotels' reliance on the collective bargaining agreement layoff provision was, according to the Board, a complete sham; the hotels never considered the qualifications of the strikers it laid off. In short, the Doral hotels were much more culpable than the Association for the discharges. On this record, we conclude that the Board acted well within its informed discretion by ordering that the Doral hotels, alone, bear the full consequences of their unfair labor practices. NLRB v. J.H. Rutter-Rex Manufacturing Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969); NLRB v. Delchamps, Inc., 653 F.2d 225, 228 (5th Cir.1981).
 
 B.
 1.
 
 41
 The Board held that the Beau Rivage Hotel's refusal to recall three striking morning waitresses violated section 8(a)(3) and (1) of the Act. The waitresses, as economic strikers, were entitled to immediate reinstatement upon their unconditional offer to work, unless the Beau Rivage demonstrated a substantial and legitimate business justification for refusing to rehire them. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 381, 88 S.Ct. 543, 546, 547, 19 L.Ed.2d 614 (1967); NLRB v. Transport Co. of Texas, 438 F.2d 258, 264 (5th Cir.1971).[15]
 
 
 42
 The Beau Rivage modified its morning restaurant service during the strike by substituting a buffet format for normal table service, thus eliminating the need for morning waitresses. Those morning waitresses who did not strike were reassigned to new positions as servers on the buffet line. No replacement waitresses were hired because the buffet service operated without waitresses.
 
 
 43
 The hotel patrons enjoyed the convenience and variety of the buffet service for their morning meals. The hotel consequently discontinued table service to capitalize on the customer satisfaction and significant labor savings. After the strike, the hotel did not reinstate the three morning waitresses because it had eliminated their positions.
 
 
 44
 According to the Board, this established no sufficient business justification for refusing to recall these waitresses because the hotel failed to show that the particular jobs eliminated belonged to the striking waitresses. The Board's decision is patently erroneous. Proof that the striking employees' jobs were permanently eliminated because of "the need to adapt to changes in business conditions or to improve efficiency" satisfies an employer's burden that its refusal to reinstate was caused by a substantial and bona fide reason for eliminating an economic striker's job. NLRB v. Fleetwood Trailer Co., 389 U.S. at 379, 88 S.Ct. at 546.
 
 
 45
 In this case, the Beau Rivage eliminated all the morning waitress positions for a bona fide reason; accordingly, it committed no unfair labor practice. An employer may permanently reassign nonstriking workers to new positions, when their old department is eliminated for bona fide business reasons, without committing an unfair labor practice against the striking employees of the closed department. The labor laws have never guaranteed an economic striker that his job will be there when the strike is over. See NLRB v. Fleetwood Trailer Co., 389 U.S. at 379, 88 S.Ct. at 546; NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938); NLRB v. Transport Co. of Texas, 438 F.2d at 264.
 
 2.
 
 46
 The Board found that the Beau Rivage violated sections 8(a)(3) and (1) of the Act by discharging Frank Marcucci, a bartender, under the "unqualified" layoff provision of the contract. Marcucci, a long-time employee, was, as we have indicated, the only one of the three bartenders to participate in the strike. The Beau Rivage hired a replacement for him during the strike. Three days after his reinstatement, he was discharged as "unqualified" ostensibly because of his sullen attitude and manner with customers. His supervisors also told him that they did not need him and that they had found another person who could do the job better.
 
 
 47
 The Board found that Marcucci's layoff was a pretext for anti-union discrimination. It based the finding upon the Beau Rivage supervisors' inconsistent explanations of why Marcucci was unqualified and the timing of his discharge. The Beau Rivage contends that this decision was not supported by substantial evidence in the record.
 
 
 48
 The hotel, through its bargaining agent, promised the Union that it would not rely upon the "unqualified," layoff provision of the new contract to escape its obligation to recall strikers. The Beau Rivage nevertheless utilized this provision to retailiate against Marcucci because he had joined the picket line. Based on this evidence, the Board's decision cannot be questioned.
 
 III.
 
 49
 For the reasons we have stated, the Board's order that the Doral hotels reinstate the post-strike picketers and that the Beau Rivage reinstate the three morning waitresses is set aside and will not be enforced. The Board's order, in all other respects, is entitled to enforcement.
 
 
 50
 Enforcement GRANTED, in part; DENIED, in part.
 
 
 
 [1]
 The discharged, post-strike picketers may have worked for the Doral Beach Hotel, the Doral Hotel and Country Club, or the Carillon. All three hotels were under common ownership and management
 
 
 [2]
 The style of this case refers to these four hotels as: The Estate of Alfred Kaskel d/b/a Carillon Hotel, The Estate of Alfred Kaskel d/b/a Doral Hotel and Country Club, The Estate of Alfred Kaskel d/b/a Doral Beach Hotel, and Beau R. Corp. d/b/a Beau Rivage Hotel
 
 
 [3]
 29 U.S.C. Sec. 158 (1982) reads in pertinent part:
 Sec. 158. Unfair labor practices
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 ....
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ....
 ....
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 
 
 [4]
 The Board found the facts we relate in Parts I.A., B., and C. They are supported by substantial evidence in the record
 
 
 [5]
 Article IV, section 4 of the collective bargaining agreement reached on January 14, 1977, which was carried forward from the old agreement, provided as follows: "The EMPLOYER shall have the right during the slack periods to reduce the number of employees by as many as it may deem appropriate, the EMPLOYER'S exercise of judgment in this regard shall be indisputable."
 Article V, section 2, provided:
 Seniority shall prevail by classifications among qualified employees in the case of layoffs due to reduction in business, provided the senior employee is, in the opinion of the EMPLOYER, qualified to perform the available job. In the rehiring of qualified laid-off employees, they shall be rehired in the inverse order in which they were laid off, the last employee laid off shall be the first re-employed, provided that such employee returned to his employment within one (1) week of the EMPLOYER'S notification to him (with a copy to the UNION) that such employee is being offered re-employment.
 
 
 [6]
 Article III, section 2 of the collective bargaining agreement provided:
 During the term of this agreement, the parties are prohibited from resorting to, utilizing, or in any way effectuating strikes, picketing, lockouts, boycotts (primary or secondary), slow-downs, or any other economic compulsion or sanctions hereinbefore or hereinafter devised for the purpose of compelling their desired objects. This clause shall bar such conduct for alleged or actual unfair labor practices. It is specifically agreed that during the term of this Agreement, neither the UNION nor its members shall have the right to respect any picket line established at any EMPLOYER'S place of business.
 
 
 [7]
 The following table summarizes the discharges at the Doral hotels
 Country Club Beach Carillon
 ------------ ----- --------
Total number 300 186 121
replacements hired
(607)
Replacements working 150 90 46
February 1, 1977
(286; 47%)
Strikers recalled 500 241 282
and who remained
at work
(1,023)
Strikers recalled 123 84 9
and laid off
as not qualified
(216; 17%)
 
 
 [8]
 The Board's opinion states that he was terminated; it fails to distinguish between being laid off for being unqualified and being discharged for cause. The layoff was completely consistent with management's statement that Marcucci was terminated for "not being qualified."
 
 
 [9]
 See supra note 3
 
 
 [10]
 We reject respondents' other contentions, without discussion, as frivolous
 
 
 [11]
 Of course, an employer, absent anti-union motivation, may discharge an employee for good reason, bad reason, or no reason without violating the labor law. Federal-Mogul Corp. v. NLRB, 566 F.2d 1245, 1260 (5th Cir.1978). Union membership is not a guarantee against discharge. NLRB v. Ray Smith Transport Co., 193 F.2d 142, 146 (5th Cir.1951). The Board does not function to second-guess management's personnel decisions or to interfere with its right to discharge when that right is exercised for reasons other than intimidation or coercion connected with protected rights. NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 495, 83 L.Ed. 627 (1939); NLRB v. Computed Time Corp., 587 F.2d 790, 795 (5th Cir.1979)
 
 
 [12]
 The Doral's executive vice president, Joel Gray, one of the Association's negotiators who was bargaining with the Union, participated in making this representation to the Union. See supra Part I.A
 
 
 [13]
 The Board gave four other reasons for finding that the Doral hotels' discharge of the post-strike picketers violated the Act. First, the immediate nature of the discharge suggested a discriminatory motive. Second, the hotels' security guards gave no explanation to the returning strikers concerning the reinstatement process. Third, the Doral supervisors inside the hotel made disparaging remarks about the Union. Fourth, the discharges were made in bad faith because the pickets would have been laid off for being unqualified had they not been discharged for violating the collective bargaining agreement
 As for the Board's first reason, the hotels' discharge of the pickets on the day after the incident, does not, without more, prove that anti-union animus motivated the action. The second reason is without merit because the security guards were under no duty to explain the reinstatement process to the returning strikers. Given the confusion at the hotel employees entrance and the hostile attitude of many of the strikers, the hotels' guards acted reasonably by asking those employees denied admittance to contact directly their supervisors by telephone for instructions. Furthermore, the no-strike rule did not catch the employees by surprise. The provision was carried forward from the expired contract. We reject the Board's third reason because the Doral supervisors' insults to the Union leadership, even if known to the picketers, could not have justified the picket line. Under the collective bargaining agreement, the Union waived the right to picket in protest of unfair labor practices. See supra note 6. The Board's final reason stands the Wright Line test on its head. See supra p. 1579. The Board should not have speculated about what might have happened, but for a legitimate management personnel decision which rendered the inquiry moot. The Board's analysis should have ended with the finding that the discharges occurred because of completely legitimate motives, based on a substantial business justification. See NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983).
 
 
 [14]
 Article I of the collective bargaining agreement provided that the contract would become effective upon execution. The Union formally executed it on January 15 and the Association did so on the morning of January 17. This clause notwithstanding, the Union and the Association created a valid and enforceable contract upon rank and file ratification on Friday, January 14. Cf. H.J. Heinz Co. v. NLRB, 311 U.S. 514, 524-26, 61 S.Ct. 320, 325-26, 85 L.Ed. 309 (1941); NLRB v. New York-KeansburgLong Branch Bus Co., 578 F.2d 472, 476-77 (3d Cir.1978); Warrior Constructors, Inc. v. International Union of Operating Engineers, Local Union No. 926, 383 F.2d 700, 707-08 (5th Cir.1967)
 
 
 [15]
 An employer may permanently replace economic strikers with new employees, in order to protect and continue operating its business, at any time before the strikers unconditionally request reinstatement. NLRB v. International Van Lines, 409 U.S. 48, 50, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972); NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938). Therefore, an employer is not guilty of an unfair labor practice in refusing to discharge persons hired to fill the places of economic strikers in order to create places for returning strikers. Id